IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ZACHARY WOOTEN,<br><br>Plaintiff,<br><br>v.<br><br>BNSF RAILWAY COMPANY,<br><br>Defendant. | CV 16-139-M-DLC-JCL<br><br><br>FINDINGS &<br>RECOMMENDATION AND<br>ORDER |

This matter comes before the Court on the parties' motions for partial

summary judgment and several evidentiary motions.

## I.    Background

Plaintiff Zachary Wooten alleges he suffered an on-the-job injury on July

31, 2015 while working as a conductor for BNSF Railway Company.  In the early

morning hours of July 31, 2015, Wooten departed Whitefish, Montana aboard a

train headed to Havre and powered by lead locomotive BNSF 6867. When the train

arrived in Coram, Montana, Wooten exited the lead locomotive to perform a roll-

by inspection of another train passing in the opposite direction. Wooten claims that

when he opened the locomotive door, he heard a pop and felt pain in his right wrist

because the door latch became stuck or otherwise failed to open.  Wooten alleges

that while he was attempting to climb back onto the locomotive after performing

the inspection, his injured wrist gave way and he fell back onto the track ballast.

Wooten claims that as a result of his fall, he suffered severe and disabling injuries to his arm and wrist.

The engineer working with Wooten that night, Matt Roth, reported Wooten's injury to dispatch and BNSF directed the train to Belton, Montana, where Wooten was picked up by an ambulance and taken to the hospital. Meanwhile, BNSF called in a replacement crew and the train continued on as scheduled, arriving in Havre early on the evening of July 31, 2015. At some point that evening, BNSF claims representative Nancy Ahern took several photographs to document the condition of BNSF 6867. The next day, a 3-Man Inspection team inspected BNSF 6867 and found no defects. On August 2, 2015, Wooten completed a Personal Injury/Occupational Illness Report Form stating that he had suffered a work-related injury to his right wrist.

In the meantime, Wooten's supervisor and Superintendent of Operations James Pino had been notified of Wooten's injury and spoke with both Roth, and Wooten about the incident. Pino also obtained a written statement from Roth, and watched BSNF video footage showing Wooten as he arrived for work on July 31, 2015. Pino's investigation led him to believe that Wooten was dishonest in reporting his injury, and had injured his wrist prior to reporting for work on July 31, 2015.

On August 3, 2015, Wooten gave a statement to BNSF claims representative Scott Jacobsen, and BSNF provided Wooten with a Notice of Investigation to determine his "responsibility, if any, in connection with [his] alleged dishonest report of a personal injury." (Doc. 101-3). As a result of its formal investigation, BNSF determined that Wooten had injured his wrist before reporting to work on July 31, 2015. BNSF terminated Wooten's employment on September 29, 2015, for making a "dishonest report of a personal injury." (Doc. 101-4).

Wooten commenced this action against BNSF in October 2016, alleging three claims for relief. First, Wooten alleges he was injured as a result of BNSF's negligence, and brings a personal injury claim under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 et seq. Second, Wooten alleges that BSNF violated the Locomotive Inspection Act, 49 U.S.C. § 20701 ("LIA") by using a locomotive that was not in proper condition and/or safe to operate without unnecessary danger of personal injury. Third, Wooten alleges that BNSF retaliated against him for reporting his injury and a hazardous safety condition, and brings a retaliation claim under the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109. Wooten seeks compensatory and other damages, including an award of punitive damages on his FRSA claim.

The parties have filed cross-motions for partial summary judgment on Wooten's FRSA claim (Count II), and BSNF has moved for summary judgment on

Wooten's LIA claim (Count III). The following motions are also pending: (1) Wooten's motion for discovery sanctions based on spoliation of evidence (doc. 115); (2) Wooten's motion to exclude or limit expert testimony based on timeliness and sufficiency of expert disclosure (doc. 151); (3) BNSF's supplemental motion for protective order and sanctions (doc. 153); (4) BNSF's motion for protective order that the deposition of litigation paralegal Linda Harvey not be had; (5) BNSF's motions in limine concerning Wooten's expert witnesses (doc. 164); (6) BNSF's motions in limine (doc. 166); (7) Wooten's motions in limine (doc. 168), and; (8) Wooten's motion for protective order precluding depositions. (Doc. 181).

On May 22, 2018 and May 23, 2018, the Court held oral argument on all of the above motions, and made several rulings and recommendations from the bench. This Findings & Recommendation and Order memorializes the Court's oral rulings and recommendations on the parties' summary judgment motions (docs. 99, 102, & 105), Wooten's motion for discovery sanctions (doc. 115), BNSF's supplemental motion for protective order and sanctions (doc. 153), and the parties' motions for protective orders to preclude various depositions (docs. 161, & 181). The parties' motions in limine to exclude or limit expert testimony and other evidence (docs. 151, 164, 166, & 168) will be addressed in a separate order.

## II. <u>Summary Judgment Motions</u>

### A. **Legal Standards**

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). A movant may satisfy this burden where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986).

Once the moving party has satisfied its initial burden with a properly supported motion, summary judgment is appropriate unless the non-moving party designates by affidavits, depositions, answers to interrogatories or admissions on file "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. 317, 324 (1986). The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials" of the pleadings. *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249-50. The Court must

view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

When presented with cross motions for summary judgment on the same matters, the court must "evaluate each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *American Civil Liberties Union of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

**B.     Cross-Motions for Partial Summary Judgment on Plaintiff's FRSA Claim (Docs. 99 & 105)**

1.     Prima Facie Case

To establish a prima case under the FRSA's anti-retaliation provisions, a plaintiff must show by a preponderance of the evidence that (1) he engaged in a protected activity as defined by statute; (2) the employer knew he engaged in the protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable personnel action. 49 U.S.C. § 42121(b); *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 157 (3d. Cir. 2013). If the plaintiff makes this showing, "the burden shifts to the employer to demonstrate 'by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absences of that behavior.'" *Araujo,* 708 F.3d at 157 (quoting 49 U.S.C. § 42121(b)(2)(B)(ii)).

Wooten moves for summary judgment on the second, third, and fourth elements of his prima facie case, and BNSF has cross-moved for summary judgment on the fourth element.[1] Notably, neither party moves for summary judgment on the first element, which requires Wooten to show that he engaged in a protected activity. The FRSA defines a protected activity to include reporting "a work-related personal injury" in "good faith." 49 U.S.C. § 20109(a), (a)(4). The parties do not dispute that Wooten reported a work-related injury to BNSF, but whether Wooten made that report in good faith is hotly contested. As both parties thus recognize, whether Wooten reported his injury in good faith is a factual issue, and one that is not subject to summary judgment. (See Doc. 101, at 15 n. 98; Doc. 106, at 14 n. 1).

Notwithstanding this factual dispute, Wooten maintains he is entitled to summary judgment on the second element of his prima facie case, which requires evidence that BNSF knew he engaged in the protected activity. Clearly, BNSF knew about Wooten's injury report. But whether Wooten made that injury report in good faith, thereby engaging in protected activity, is disputed. Because the parties

_____

[1] Wooten argues BNSF's motion on the FRSA claim should be denied because it was filed serially with its motion for summary judgment motion on the LIA claim in an attempt to evade the word limit set forth in Local Rule 7.1. (Doc. 132, at 7). Wooten also argues the motion should be denied because BNSF filed its Statement of Undisputed Facts 15 hours after it filed its supporting brief, in violation of Local Rule 56.1 which requires simultaneous filing. (Doc. 132, at 9). Both arguments are without merit.

dispute whether Wooten engaged in a protected activity in the first place, it cannot be said as a matter of law that BNSF *knew* he engaged in a protected activity. Wooten's motion for summary judgment on this element should be denied.

Wooten also moves for summary judgment on the third element, which requires proof of an unfavorable personnel action. There is no dispute that Wooten was discharged from his employment with BNSF, which means this element is satisfied. But because this element is not in dispute and evidence that Wooten was discharged will undoubtedly be introduced at trial, granting summary on this element alone would not eliminate any issues or serve any other useful purpose. Wooten's motion for summary judgment on this element should be denied.

Wooten and BNSF both seek summary judgment on the fourth element, which requires proof that the alleged protected activity was a contributing factor in the unfavorable personnel action. The parties disagree on the proof this element requires. Wooten argues the standard is a lenient one, and cites *BNSF Ry. Co. v. U.S. Dep't of Labor*, 816 F.3d 628, 639 (10th Cir. 2016) for the proposition that a plaintiff need only show by a preponderance of the evidence that the protected activity "was one of the factors that tended to affect in any way the personnel action." (Doc. 101, at 17). Wooten maintains this burden can be met with circumstantial evidence, including evidence of temporal proximity. (Doc. 101, at

17, citing *DeFrancesco v. Union Pacific R.R.*, ARB No. 10-114, 2012 WL 694502 *3 (Feb. 29, 2012)).

Wooten further argues the "contributing factor" standard is satisfied if "the protected activity and the adverse action are 'inextricably intertwined'." (Doc. 101, at 18 (citing *Stallard v. Norfolk S. Ry. Co.*, ARB No. 16-028, 2017 WL 4466937, at *8 (Sept. 29, 2017)). Wooten maintains it is not possible to explain BNSF's decision to terminate his employment without reference to his report of a personal injury, which means the two are inextricably intertwined and he is entitled to summary judgment on the contributory factor element of his FRSA claim.

BNSF takes the position that a more stringent standard applies, and contends that in order to satisfy the contributing factor element a plaintiff must prove "intentional retaliation prompted by the employee engaging in protected activity." (Doc. 106, at 15, citing *Kuduk v. BNSF Ry. v. Co.*, 768 F.3d 786, 791 (8th Cir. 2014). BNSF maintains a plaintiff must also prove that the protected activity was the "proximate cause" of the adverse employment action, and claims evidence of temporal proximity alone is not sufficient. *Kozaria v. BNSF Ry. Co.*, 840 F.3d 873, 877-78 (7th Cir. 2016). Even assuming Wooten engaged in protected activity, BNSF argues Wooten cannot establish proximate cause or intentional retaliation because the undisputed evidence shows that it discharged Wooten based on its

good faith belief that he had been dishonest in reporting an on-the-job injury, not because he engaged in protected activity.

As consistently applied by district courts in the Ninth Circuit even after the *Kuduk* and *Kozaria* decisions, the contributing factor element "does not require that the employee conclusively demonstrate the employer's retaliatory motive." *Despain v. BNSF*, 2018 WL 1894708 *6 (Feb. 20, 2018 D. Ariz.) (citing *Araujo*, 708 F.3d at 158-59). See also *Coppinger-Martin v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010). "Rather, the employee need only make 'a prima facie showing that protected behavior or conduct was a contributing factor in the unfavorable personnel action alleged in the complaint." *Coppinger-Martin*, 627 F.3d at 750.

Evidence of the requisite degree of discriminatory animus on the part of the employer may be circumstantial, including evidence of temporal proximity. *Despain*, 1894798 *6. "Other possibilities include 'indications of pretext such as inconsistent application of policies and shifting explanations, antagonism or hostility toward protected activity, the relation between the discipline and the protected activity, and the presence of intervening events that independently justify discharge.'" *Despain*, 2018 WL 1894708 *6 (quoting *Loose v. BNSF Ry. Co.*, 865 F.3d 1106, 1112013 (8th Cir. 2017)). In *Despain,* for example, the court found on summary judgment that retaliatory animus was inferable based on circumstantial

evidence, including "the weakness of BNSF Railway's assertion that the injury claim was dishonest." *Despain*, 2018 WL 1894708 *6.

Under this standard, neither party is entitled to summary judgment on the contributing factor element of Wooten's FRSA claim because there is a genuine issue of material fact as to whether BNSF acted with the requisite degree of retaliatory animus. Evidence of the temporal proximity between Wooten's injury report and the date of his discharge is relevant for purposes of showing retaliatory intent and satisfying the contributing factor element. In addition, Wooten submitted a heavily redacted copy of BNSF's 2015 end-of-year performance review for Pino, who describes himself as "the lead on driving [the] investigation and ultimately terminating" Wooten. (Doc. 123). In the self-assessment safety section of the review, Pino explains that "the numbers are inflated by an injury that was falsely reported" and "if we consider the falsely reported injury" they "would be approaching 1 year injury free." (Doc. 123). The unredacted version of Pino's 2015 end-of-year performance review shows that he received an "On Target" safety rating from his manager, Dan Fransen.[2] But on Pino's 2015 mid-year

---

[2] At the February 22, 2018, hearing, BNSF was ordered to provide the Court with unredacted copies of 2014 and 2015 performance reviews for several employees, including Pino and Fransen, for in camera review. The Court reviewed BNSF's in camera submission, and at the hearing on May 23, 2018, directed BNSF to provide Wooten with unredacted copies of the relevant portions of Pino's and Fransen's mid-year and end-of-year performance reviews for 2015.

performance review, which was completed on July 28, 2015 just a few days before Wooten's injury report, Fransen gave Pino a "Needs Improvement" safety rating. Fransen stated that the trending "improvement in safety which would include reportable injuries along with our total injuries…must continue through the remainder of 2015 as I believe we can have a very successful year." Fransen's safety rating also improved during this period. He received an "On Target" safety rating on his 2015 mid-year performance review, and an "Exceeds Target" rating on his 2015 end-of year-review. The Incentive Compensation Program example submitted by BNSF for in camera review and disclosed to Wooten's counsel shows that such individual performance ratings can result in a Performance Management Process adjustment, thereby affecting compensation.

Drawing all inferences in Wooten's favor, this evidence suggests that BNSF may have incentivized retaliation by managers and supervisors by linking their individual performance reviews to the number of on-the-job injuries reported. Assuming Wooten engaged in protected activity by reporting an on the job injury in good faith, he has come forward with sufficient evidence to raise a genuine issue of material fact as to whether BNSF retaliated again him for doing so. In light of these factual issues, neither party is entitled to summary judgment on the contributory factor element of Wooten's FRSA claim.

Alternatively, BNSF moves for summary judgment on the ground that it has established by clear and convincing that it would have taken the same unfavorable personnel action even in the absence of Wooten's alleged protected activity. The alleged protected activity here is the good faith reporting of an on-the-job injury. It is undisputed that BSNF discharged Wooten for making a "dishonest report of a personal injury." (Doc. 101-4). Assuming Wooten engaged in protected activity by reporting an on-the-job injury in good faith, BNSF does not point to any evidence that it would have discharged him for other legitimate reasons.

To the extent BNSF argues it would have discharged Wooten for dishonesty even if he had not submitted an injury report, BNSF has not established that it is entitled to summary judgment. BNSF explains that dishonesty is a stand-alone dismissible event under its Policy for Employee Performance Accountability (PEPA), and cites comparator information showing that it consistently applies and enforces its discipline policies, including prohibitions against dishonesty. In response, Wooten submits evidence that railroad managers have discretion in assessing "levels of dishonesty" and comparator information showing that BNSF does not consistently impose identical discipline on all employees who violate the prohibition against dishonesty. (Doc. 100, ¶¶ 50-52, 86-92). This evidence is sufficient to raise a genuine issue of material fact.

2. Failure to Mitigate

13

Wooten moves for summary judgment on BNSF's affirmative defense of failure to mitigate. The parties agree that Wooten had a duty to mitigate his damages by using "reasonable diligence in finding other suitable employment." *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231 (1982). While the duty to mitigate lies with the injured party, the burden of proving a failure to mitigate lies with employer. See *Sangster v. United Air Lines, Inc.*, 633 F.2d 864, 868 (9th Cir. 1980). In most cases, an employer satisfies this burden by establishing that (1) "there were substantially equivalent jobs available, which [the plaintiff] could have obtained," and (1) the plaintiff "failed to use reasonable diligence in seeking one." *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 906 (9th Cir. 1994).

Wooten argues BNSF's failure to mitigate defense fails as a matter of law because BNSF has not provided enough evidence to create a question of fact as to (1) whether any alternative employment was available to Wooten; (2) whether Wooten failed to use reasonable efforts to secure such employment; and (3) the amount by which damages would have been reduced had Wooten satisfied his obligation.

Contrary to Wooten's argument, BNSF has presented sufficient evidence on all three of these points to survive summary judgment.[3] With respect to

_____

[3] Because BNSF has presented sufficient evidence on all three points, the Court need not address BNSF's argument that it is not required to show alternative

substantially equivalent employment, BNSF has submitted evidence from damages expert Katherine Dunlap that alternate and equivalent employment opportunities were available in the railroad industry in various cities in Washington, Utah, Idaho, and Wyoming.[4] (Doc. 134, ¶ 98). While Wooten argues he should not have been required to relocate to any of these locations, whether it would have been reasonable to expect that he do so under the circumstance is a question for the trier of fact.

As to the reasonableness of Wooten's efforts to secure alternative employment, BNSF points to evidence that he submitted only one employment application, which was for a job at car dealership, and did not actively seek out any other employment. While Wooten is now working as an insurance agent, BNSF claims that is only because he was offered the job by a former acquaintance. (Doc. 134, ¶ ¶95, 96). In addition, Dunlap states in her expert report that diligence obtaining equivalent employment should entail engaging in job search activities on a full-time basis. (Doc. 134, ¶ 97). According to BNSF, Wooten did not meet this

---

employment was available if it can demonstrate that Wooten failed to use reasonable diligence.

[4] Wooten objects to Dunlap's expert report on the ground that it is unsworn and inadmissible. (Doc. 101, at 26). Even assuming that would preclude the Court from considering the report on summary judgment, BNSF has cured any defect by filing Dunlap's declaration attesting to her report. (Doc. 134-13).

time commitment. The reasonableness of Wooten's mitigation efforts is for the jury to consider.

Finally, Wooten argues that even if he failed to mitigate, BNSF has not presented any evidence showing the amount by which his damages should be reduced. But Dunlap addresses damages in her expert report, which is sufficient for summary judgment purposes. Wooten argues that Dunlap's conclusions are not supported, but such arguments are for the trier of fact to consider. Wooten's motion for summary judgment on BNSF's affirmative defense of failure to mitigate should be denied.

### 3. Punitive Damages

BNSF moves for summary judgment on Wooten's request for punitive damages. To recover punitive damages under the FRSA, Wooten must prove that BSNF acted "[w]ith malice or ill will or with knowledge that its actions violated federal law or with reckless disregard or callous indifference to the risk that its actions violated federal law." *Worcester v. Springfield Terminal Railway Company*, 827 F.3d 179, 182 (1st Cir. 2016) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). BNSF maintains that the undisputed evidence establishes that it followed its written policies prohibiting retaliation (doc. 111), and argues Wooten has not come forward with any evidence upon which a jury might find that it acted with the requisite level of intent to support an award of punitive damages.

In response, Wooten points to evidence showing that BNSF anticipated litigation on the very day he was injured. (Doc. 90-6). Wooten also cites deposition testimony from Pino explaining that within 24 hours of the alleged incident, he had determined based on video taken as Wooten arrived to work on the night in question that Wooten was injured before he showed up for work. (Doc. 90-7, at 2). The Court also remains mindful, as previously discussed, that Wooten has established the existence of a genuine issue of material fact as to whether BNSF acted with discriminatory animus in terminating his employment. Thus, viewing the evidence in the light most favorable to Wooten and drawing all inferences in his favor, a reasonable trier of fact could find that BNSF, through its employees, acted with reckless disregard in terminating Wooten's employment. Whether the standard for punitive damages is satisfied is better left to the jury.

### 4. Exhaustion of Administrative Remedies

Finally, BNSF moves for summary judgment on Wooten's FRSA claim based on failure to exhaust his administrative remedies. The FRSA states that an employee "may seek relief in accordance with the provisions of this section, with any petition or other request for relief under this section to be initiated by filing a complaint with the Secretary of Labor." 49 U.S.C. §20109(d)(1). "The text of the statute therefore makes clear that to receive relief under the FRSA, litigants must first file a complaint with OSHA alleging unlawful discrimination." *Foster v.*

*BNSF Railway Company*, 866 F.3d 962, 966 (8th Cir. 2017); See 49 U.S.C. §20109(d)(2); 49 U.S.C. § 42121(b)(1); 29 C.F.R. § 1982.103. The FRSA's exhaustion requirements are met "where the retaliation claim is reasonably related to the administrative complaint." *Finley v. Salazar*, 2013 WL 1209940, at *2 (D. Mont. Mar. 25, 2013); See also *Vasquez v. County of Los Angeles*, 349 F.3d 634, 644 (9th Cir. 2004).

Wooten filed an OSHA complaint alleging he engaged in protected activity by notifying BNSF that he had suffered a work-related personal injury. In his Complaint in his case, Wooten alleges he also engaged in protected activity by "reporting in good faith a hazardous safety condition" by reporting a "defective latch on a locomotive door." (Doc. 1 § 22). BNSF argues Wooten cannot raise those claims in this case because he did not include similar allegations in his OSHA complaint.

But because Wooten's report of a personal injury stated that he injured his wrist as a result of a door latch that was not functioning properly, his claim that he engaged in protected activity by reporting a hazardous safety condition is reasonably related to his OSHA complaint. Therefore, BNSF's motion for summary judgment on failure to exhaust administrative remedies should be denied.

    **C.**    **BNSF's Motion for Summary Judgment on Plaintiff's LIA Claim (Doc. 102)**

BNSF moves for summary judgment on Wooten's claim under the Locomotive Inspection Act ("LIA"), 49 U.S.C. § 20701. The LIA provides that "[a] railroad carrier may use…a locomotive…on its railroad line only when the locomotive…and its parts and appurtenances are in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701(1). Thus, "[i]n order to state a violation of the LIA, the plaintiff must show that the complained of condition created a safety hazard." *Glow v. Union Pac. R.R. Co.*, 652 F. Supp. 2d 115, 1143 (E. D. Cal. 2009) (citing *Oglseby v. S. Pac. Transp. Co.*, 6 F.3d 603, 609 (9th Cir. 1993).

BNSF argues that Wooten's LIA claim fails for two reasons. First, BNSF maintains there is no evidence that the door latch was defective or in an unsafe condition, as those terms are construed under the LIA.  To the contrary, BNSF claims the undisputed evidence shows the door latch on BNSF 6867 was working properly on the night of Wooten's alleged injury.  For example, BNSF points out that the engineer working with Wooten that night, Matt Roth, testified at his deposition that he did not notice anything out of the ordinary with respect to the door latch. (Doc. 104-1). Consistent with Roth's testimony, the 3-Man Inspection team responsible for inspecting BNSF 6867 the day after the incident found no defects and determined that no repairs to the locomotive were needed. (Doc. 104-6). Because the inspection team did not find any defects, BNSF 6867 remained in

service. (Doc. 104-9). Through August, September, and October of 2015, BNSF did not receive any reports that the door latch in question ever malfunctioned or was otherwise defective. (Doc. 104-8). BNSF argues the evidence described above establishes as a matter of law that BNSF's door latch was not defective or in an unsafe condition.

But Wooten testified at his deposition that as he went to exit BSNF 6867 to perform the roll-by inspection, the locomotive door failed to open on his first attempt and when he tried again, the door swung open and he heard a pop in his wrist. (Doc. 101-5, at 7). Wooten's testimony is sufficient to raise a genuine issue of material fact as to whether the locomotive door latch was in proper condition and safe to operate within the meaning of the LIA.[5]

Second, BNSF argues the only physical evidence of a door latch defect on BNSF 6867 was the result of later manipulation. On October 27, 2015 – approximately three months after Wooten's injury – BSNS employee Mark Voelker recognized BNSF 6867 as the locomotive on which Wooten claimed he was injured and decided to examine the door latch. Voelker described his

---

[5] BNSF argues in a footnote that to the extent Wooten argues the design of the locomotive door is defective his claim is precluded under the LIA. (Doc. 103, at 13 n. 3). For support, BNSF cites *Law v. General Motors Corp.*, 114 F.3d 908, 910-11 (9th Cir. 1997), which holds that state common law design defect claims are preempted by the LIA. Wooten is not bringing a state common law design defect claim.

observations in an email the next day to Wooten's counsel, stating that "[t]he inside handle and mechanism was loose and all four of the screws holding the mechanism to the door were working their way out and were loose as well." (Doc. 104-10). Because the 3-Man Inspection team did not find any defects when it inspected BNSF 6867 the day after Wooten reported his injury, BNSF argues the latch must have been manipulated at some later date. For further support, BNSF points to the deposition testimony Matt Roth, who was the conductor on BNSF 6867 and was present when Voelker examined the door latch. Roth testified that to him, it appeared as if someone had recently taken a tool and loosened the bolts on the locomotive door latch. (Doc. 104-15). Likewise, the conductor and engineer on BNSF 6867 during the October 27, 2015 shift have both stated that they did not recall any issues with the door latch. (Docs. 104-16; 104-17).

But Voelker's credibility, and whether the condition of the door latch as described by Voelker was the result of manipulation after the date of Wooten's are for the trier of fact to consider. For summary judgment purposes, Voelker's observations and Wooten's testimony are sufficient to create a genuine issue of material fact as to whether the locomotive door latch was in proper condition and safe to operate without unnecessary danger of personal injury as required by under the LIA. BNSF's motion for summary judgment on Wooten's LIA claim should be denied.

## III.    Evidentiary Motions

### A.    Plaintiff's Motion for Discovery Sanctions (Doc. 115)

Plaintiff has filed a motion for discovery sanctions pursuant to Federal Rule of Civil Procedure 37 based on the alleged spoliation of evidence. "Spoliation of evidence is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future litigation." *Bel Air Mart v. Arnold Cleaners, Inc.,* 2014 WL 763185 *3 (E.D. Cal. Feb. 21, 2014) (*quoting Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009)). "The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Bel Air Mart*, 2014 WL 763185 *3 (*quoting World Courier v. Barone,* 2007 WL 1119196 (N.D. Cal. Apr. 16, 2007)).

Where a party to subsequent litigation loses or destroys evidence before litigation commences, the court may impose spoliation sanctions pursuant to its inherent authority.  *See Leon v. IDX Systems Corp.*, 464 F.3d 951, 959 (9th Cir. 2006); *Unigard Security Ins. Co. v. Lakewood Engineering & Manufacturing Corp.*, 982 F.2d 363, 368 (9th Cir. 1992).  This inherent authority gives the court "broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial." *Unigard Security Ins. Co.*, 982 F.2d at 368.

"The moving party has the burden of demonstrating sanctionable conduct and prejudice." *Bel Air Mart*, 2014 WL 763185 *4 (*quoting Rev 973 LLC v. Mouren-Laurens,* 2009 WL 273205 *1 (C.D. Cal. 2009). To support a finding that spoliation has taken place, "the evidence destroyed must be relevant or 'material evidence.'" *Lavell Enterprises, Inc. v. American Credit Card Processing Corp.*, 2007 WL 4374914 *11 (D. Mont. Dec. 11, 2007) (*citing Silvestri v. General Motors Corp.*, 271 F.3d 583, 592 (4th Cir. 2001)). "Absent a finding that the destroyed evidence was relevant or material, a sanction for spoliation cannot be imposed." *Lavell*, 2007 WL 4374914 *11.

"The court may impose a range of sanctions for spoliation of evidence depending on the culpability of the party responsible for its destruction and the prejudice caused to the opposing party." *Maxim v. FP Holdings, LP*, 2014 WL 200545 *2 (D. Nev. Jan. 2, 2014). In particular, the court may: (1) order the exclusion of certain evidence; (2) admit evidence of the circumstances surrounding the destruction of evidence; or (3) instruct the jury that it may draw an adverse inference against the spoliating party. *Peschel v. City of Missoula*, 664 F. Supp.2d 1137, 1141 (D. Mont. 2009). In addition, "[d]ismissal is an available sanction when 'a party has engaged deliberately in deceptive practices that undermine the integrity of the judicial proceedings' because 'courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in

conduct utterly inconsistent with the orderly administration of justice.'" *Leon*, 464

F.3d at 958 (*quoting Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69

F.3d 337, 348 (9th Cir. 1995)).

Drawing from *Leon* and *Halaco Engineering Co. v. Castle*, 843 F.2d 376,

380 (9th Cir. 1988), this Court has held that the following factors are to be

considered before a dispositive sanction can be imposed for the spoliation of

evidence (1) the presence of extraordinary circumstances; (2) willfulness, bad

faith, or fault by the offending party; (3) the relationship between the misconduct

and the matters in controversy; (4) the risk of prejudice to the party seeking

sanctions; (5) the public policy favoring disposition of cases on their merits, and;

(6) the efficacy and availability of lesser sanctions.  *Peschel*, 664 F.Supp.2d at

1142.

Wooten claims that BNSF spoliated three categories of evidence: (1)

original videos recorded on several BNSF Lococam video modules on July 31,

2015, and August 1, 2015; (2) original digital data and metadata evidence

regarding photographs that BNSF alleges were taken by claims agent Nancy Ahern

and mechanical officer Matt Collins on July 31, 2015, and August 1, 2015, and; (3)

the locomotive door and door handle on BNSF 6867.  (Doc. 116, at 6-7). Wooten

argues this evidence was directly relevant to the parties' claims and defenses, and

BSNF either decided to destroy or failed to preserve the evidence. Wooten asks the

Court to impose sanctions against BNSF "by entering judgment in his favor, or in the alternative, imposing the highest sanction which the Court finds warranted." (Doc. 116, at 25).

BNSF does not dispute that it recognized the prospect of litigation immediately after Wooten reported his injury, thereby triggering its duty to preserve relevant evidence. BNSF argues it did just that, and took reasonable steps to collect and preserve evidence that might be relevant to future litigation. Even if Wooten could establish that it spoliated evidence, BNSF argues sanctions are not warranted because he has not shown any substantial prejudice as a result.

### 1. Videos

Wooten contends that BNSF failed to preserve video evidence from three BNSF locomotives: (1) BNSF 6867, the lead locomotive on which Wooten claims he was injured; (2) BNSF 4080, the locomotive directly behind BNSF 6867, and; (3) BNSF 7421, the lead locomotive on a train moving past Wooten's location in the opposite direction at about the time of his roll-by inspection.

All three locomotives were equipped with General Electric Company ("GE") camera systems, which hold up to 72 hours of video taken from the front and both sides of a locomotive, and automatically stop recording five minutes after a locomotive has stopped moving. Video footage from the GE camera systems can be preserved either by pulling the physical video module from the locomotive and

uploading the original video, or by remotely downloading video in 12 second clips through a system called Wi-Tronix. (See Docs. 146-9; 146-10).

BNSF pulled the physical module from BNSF 6867 and uploaded original video taken at about the time of Wooten's alleged injury while the train was at Coram. (Docs. 83, at 46; 146-9, at 2). Wooten cannot be seen on the uploaded video, which shows the top portion of the locomotive door opening and closing but did not capture alleged incident. (Doc. 146-11). The physical module from BNSF 6867 has apparently been placed back in service on a different locomotive.

Instead of pulling the physical modules from BNSF 4080, BNSF preserved partial Wi-Tronix video downloads taken while the train was at Coram. Because BNSF 4080 was directly behind BNSF 6867, the camera's field of vision was obscured and the video does not show anything relevant. (Doc. 146-11).

BNSF also preserved partial Wi-Tronix video downloads from BNSF 7421 as it passed Wooten's location shortly after the alleged incident. (Doc. 146-11). The video from BNSF 7421 shows the light from Wooten's lantern for approximately six seconds, and Wooten is visible for approximately four seconds. (Doc. 146-11).

Wooten argues BNSF should have pulled the physical modules from all three locomotives and preserved all 72 hours of video. In particular, Wooten faults BNSF for failing to preserve any video from BNSF 6867 and 4080 while the train

was in Whitefish, where he boarded at the beginning of his shift, in Belton, where he received help getting off the train after the alleged incident, or in Havre, where locomotive 6878 was inspected. Wooten argues video from those locations may have contained relevant footage showing him both before and after the alleged incident, and claims BNSF's failure to preserve such footage constituted spoliation.

In response, BNSF argues that its preservation of locomotive video was both reasonable and proportional to the needs of the case. See *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F.Supp.2d 598, 612 (S.D. Tex. 2010) (stating that reasonableness and proportionality should be considered in the spoliation analysis). BNSF's evidence preservation manager, Larry Fernandes, detailed the logistical and technological burdens associated with pulling the video modules and saving 72 hours of video. (Docs. 146-9; 146-13). BNSF explains that it decided what video to collect and preserve based on a number of factors affecting the likelihood that the video would contain relevant footage, including each camera's field of vision and the fact that recording automatically stops after a locomotive is idle for five minutes.

Wooten also challenges BNSF's decision to provide Wi-Tronix video downloads from BNSF 4080 and 7421, instead of uploading original video directly from the physical modules. According to Fernandes, BNSF does not alter or edit

videos, include video downloaded through W-Tronix. But Wooten nevertheless questions the "foundation" and "accuracy" (doc. 116, at 17) of Fernandes' statement and BNSF's Wi-Tronix video downloads. Wooten claims that BNSF produced Wi-Tronix video from another locomotive, BNSF 8197, that was obviously edited because it showed the same footage twice in succession. (Docs. 116, at 18; 116-20). Wooten argues the only way to check the authenticity and foundation for accuracy of the video BNSF saved in this case would be to compare it to the full original video that has been destroyed.

Again, BNSF steps forward with an explanation. BNSF acknowledges that the video from BNSF 8197 shows the same footage twice, but as Fernandez explains it, "[p]ulling video though Wi-Tronix is not an exact science" and sometimes multiple requests for video will have to be made to get all of the footage sought. When that happens, the video repeats because overlapping footage was pulled through Wi-Tronix. (Docs. 146-9, 146-13).

For the most part, Wooten's concerns regarding the preservation, accuracy, and foundation of the locomotive video at issue can be adequately addressed at trial, on cross-examination. Nevertheless, the Court finds based on the argument and evidence presented, that it is appropriate to allow Wooten to put on evidence as to the circumstances surrounding the alleged spoliation of BNSF 6867's video module and the other locomotive video at issue. The jury will be allowed to draw

whatever reasonable inferences may follow from the evidence presented. In addition, admitting this evidence at trial will give the Court the opportunity to further consider giving an adverse inference instruction should the Court determine it is warranted.

### 2. Locomotive Inspection Photographs

Wooten next argues that BNSF failed to preserve original digital media with metadata from photographs taken by Ahern and BNSF's 3-Man Inspection team while inspecting BNSF 6867 in Havre after the alleged incident.

Matt Collins was the mechanical floor supervisor at the Havre Diesel Shop who arranged the 3-Man Inspection of BNSF 6867, which was carried out by three diesel shop employees and took place on July 31, 2015. (Doc. 146-3). The 3-Man Inspection Report found no defects with the locomotive door or door handle on BNSF 6867. (Doc. 104, ¶ 7). During the inspection, the 3-Man crew took several photographs of the locomotive, including the door. (Doc. 146-3, at 7). It was later realized that the date stamp on the camera was not set correctly when the photographs were taken, making it appear that they were taken in 2009. (Doc. 146-4).

BNSF claims representative Nancy Ahern also took several photographs of BNSF 6867 to document its condition on July 31, 2015. (Doc. 146-5). At her deposition, Ahern testified that the "believe[d]" she took the photographs with her

iPhone (doc. 146-5, at 4), but underlying data from the photographs demonstrates that they were taken with a Canon PowerShot A2000. Ahern has a Canon PowerShot A2000 that she sometimes used to take photographs for her investigations. Based on the photograph data, Ahern later attested that she used the Canon PowerShot A2000 camera to take the photographs of BNSF 6867. (Doc. 146-6).

BNSF states that it has provided Wooten with the original inspection photographs taken by Ahern and the 3-Man Inspection team.  (Doc. 146, at 17). According to BNSF, those photographs show there were no defects or other problems with the locomotive door handle on which Wooten claims he was injured on July 31, 2015.  BNSF also states that it provided Wooten with the metadata for the inspection photographs on January 17, 2017, and explained in a letter to Wooten's counsel that the file names had been changed, but the photographs and data had not been modified.  (Doc. 146-14).

Wooten nevertheless challenges the foundation and authenticity of the photographs provided by BNSF, and stands by his position that whatever metadata BNSF has produced thus far is not sufficient.  Wooten's expert, Edward Baker, explains that unlike original metadata, reproduced metadata on photographs showing the "date taken" can be easily altered on any computer. (Doc. 116-20). Wooten maintains that he needs the "original SD/media cards and digital

photographic metadata media originally captured" by the cameras used by Ahern and the 3-Man Inspection team in order to establish the actual date on which the photographs were taken. (Doc. 160, at 9).

As directed by the Court at the hearing on May 21, 2018, if the original SD/media card from the camera used by Ahern to take photographs of BNSF 6867 is in BNSF's possession, BNSF must produce it for Wooten on or before June 1, 2018. Otherwise, the Court finds that Wooten's arguments about the foundation and authenticity of BNSF's inspection photographs are not a sufficient basis for imposing spoliation sanctions. Wooten's concerns regarding the accuracy and foundation of those photographs can be adequately addressed at trial, through expert testimony and on cross-examination.

### 3. Locomotive door and handle

Wooten claims he was injured on July 31, 2015, when he tried to open the door on BSNF 6867 and the "door latch became stuck or otherwise failed to open." (Doc. 1, ¶ 9). Wooten points out that BNSF was aware of this claim by the time the train arrived in Havre just hours after his alleged injury, and argues BNSF should have removed the locomotive door and/or door handle and component parts on July 31, 2015 to preserve them as the best evidence for use in future litigation.

BNSF explains that it did not immediately remove the locomotive door because the 3-Man Inspection did not find any mechanical defects, and a

replacement door was not immediately available. (Doc. 146-5, at 2). BNSF

ordered a replacement door, which arrived at the Havre Diesel Shop approximately

three months later, in late October 2015. (Docs. 146-5; 146-7). In the meantime,

BNSF 6867 remained in service and no other problems or defects were reported.

(Doc. 104, ¶¶ 10-11). When the replacement door arrived in late October 2015,

BNSF removed the locomotive door and preserved it for evidence. (Doc. 146-5).

At trial, Wooten is certainly entitled to challenge BNSF's explanation and

the reasonableness of its decision to keep BNSF 6867 in service while waiting for

a replacement door. But under the circumstances, he has not shown that BNSF

engaged in sanctionable spoliation.

## B.     BNSF's Supplemental Motion for Protective Order and Sanctions (Doc. 153)

BNSF moves the Court to enter a protective order and impose sanctions

pursuant to its inherent authority and under Federal Rule of Civil Procedure 37(c).

In short, BNSF claims that ex-BNSF management employee, Michael Hart,

misappropriated several thousand privileged, confidential, and proprietary BNSF

documents upon his termination and wrongfully shared more than two hundred of

those documents with Wooten's counsel. While BNSF certainly has a bone to pick

with Hart and has apparently initiated litigation against him in Texas, Hart's

conduct is not the subject of this motion. Instead, BNSF's motion addresses the

conduct of Wooten's counsel. BNSF claims that Wooten's counsel violated

professional ethics rules, federal and local disclosure requirements, and principles of fair play by accepting the misappropriated BNSF documents from Hart and attempting to use them in this litigation. BNSF asks the Court to (1) order Wooten to return all of the misappropriated documents to BNSF; (2) prohibit Wooten and his counsel from disseminating and/or using the documents during this or future litigation; (3) impose monetary sanctions; (4) award BNSF its attorney fees and costs incurred filing this motion; and (5) disqualify Wooten's counsel, or alternatively, order the deposition of Wooten's counsel and require in camera inspection of documents and communications exchanged between Hart and Wooten's counsel.

## 1.    Additional Background

In early summer 2017, Wooten's counsel learned from another FELA plaintiff's attorney that Hart was making himself available as a consulting expert to plaintiff's lawyers bringing claims against BNSF. Wooten's counsel spoke to Hart and indicated that he was interested in the information Hart had, but told Hart he did not want to obtain any attorney-client communication or other information that would not be otherwise discoverable. (Doc. 75-1, ¶ 7). On October 6, 2017, Hart emailed more than two hundred pages of BNSF documents to Wooten's counsel, several of which were marked privileged or confidential. ("Hart documents"). (Docs. 76, 76-1). Approximately one week later, Wooten's counsel introduced

three of those BNSF documents during Ahern's deposition. (Doc. 46-5). Those three documents included: (1) 2016 Goals (doc. 76, at 3-23); (2) BNSF General Claims Department 2015 Goal Period – Manager (doc. 76, a 166-67) and; (3) BNSF General Claims Department 2014 Goal Period – Senior Claim Representative and Assistant Manager (doc. 76, at 183-90).   BNSF objected, and later learned that Wooten's counsel had gotten the documents from Hart.

In November 2017, BSNF issued a subpoena to Hart in Oregon, directing him to produce the following: (1) "all documents that you had use of or access to at [BSNF] that you have provided to any third party from the date of your employment with BNSF to the present; (2) "all documents, communications, e-mail or text messages sent to or received from any employee, agent, owner or representative of" Wooten's counsel's law firm; (3) "all records of payment received from [Wooten's counsel's law firm] from January 1, 2017 to present;" and (4) "all documents, communications, e-mail or text messages you sent to or received from any attorney that is prosecuting claims against BNSF." (Doc. 171-3).

Hart produced nearly 200 pages of documents in response to item (1) of the subpoena, and Wooten filed a motion to quash items (2)-(4) of the subpoena in the United States District Court for the District of Oregon. (Doc. 171-3; 76). The documents Hart produced in response to the subpoena overlap significantly with

those that Wooten's counsel obtained from Hart. (Compare Doc. 76 with 76-1). On January 9, 2018 the Oregon court granted Wooten's motion to quash items (2)-(4), and sua sponte quashed item (1). (Doc. 171-4). With respect to items (1) and (4), the court found the subpoena requested "so much information unrelated to the Montana case that it looks to me that the defense is simply trying to use this as a vehicle to investigate a much broader frustration they have with Mr. Hart." (Doc. 171-4, at 11). With respect to items (2) and (3), the court found that because Wooten's counsel had hired part as a nontestifying expert, the documents requested were "privileged or work product." (Doc. 171-4, at 12-13).

In the meantime, on December 1, 2017, BNSF filed a Motion for Protective Order and Sanctions related to the Hart documents (Doc. 67). At a hearing on December 19, 2017, the Court addressed several pretrial motions, including BNSF's motion for a protective order and sanctions. (Doc. 83). After considerable discussion with counsel, the Court ordered that BNSF filed a renewed motion for protective order addressing whether the Hart documents are confidential and privileged, at which point the Court would address the issue of sanctions if appropriate. (Doc. 83, at 75-77).

### 2.    The Hart Documents

Consistent with the Court's directive, BNSF filed the pending supplemental motion for protective order and sanctions on April 3, 2018. (Doc. 153). BNSF

argues the documents Hart conveyed to Wooten's counsel contained (a) attorney-client and work-product privileged information; and (b) confidential and proprietary information.

(a)     *Attorney-Client and Work-Product Privileged*
        *Information*

The attorney-client privilege protects confidential communications between an attorney and client made in confidence for the purpose of securing legal advice. See e.g. *United States v.* Chen, 99 F.3d 1495, 1501 (9th Cir. 1996). The burden of establishing that the attorney-client applies rests with the party asserting the privilege. *Tornay v. United States*, 840 F.2d 1424, 1426 (9th Cir. 1988).

The work-product doctrine protects from discovery "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). "It is well established that documents prepared in the ordinary course of business are not protected by the work-product doctrine because they would have been created regardless of the litigation." *Heath v. F/V ZOLOTOI*, 221 F.R.D. 545, 549-50 (W.D. Wash. 2004). A "dual purpose document" is one that serves "both a non-litigation and a litigation purpose." *American Civil Liberties Union of Northern California v. U.S Dept. of Justice*, 880 F.3d 473, 485 (9th Cir. 2018). "A dual purposes document is considered 'prepared or obtained because of the prospect of litigation' if it 'would not have been created in substantially similar form but for the prospect

of…litigation.'" *ACLU,* 880 F.3d at 485-86 (quoting *In re Grand Jury Subopoena*, 357 F.3d 900, 907 (9th Cir. 2004)). Attorney work product need not "be prepared in anticipation of specific litigation to be privileged," and is protected if it "is aimed directly for use in (and will inevitably be used in0 litigating cases." *ACLU*, 880 F.3d at 487 (quoting *National Association of Criminal Defense Lawyers v. Dept. of Justice Executive Office for United States Attorneys*, 844 F.3d 246, 254 (D.C. Cir. 2016). The party claiming work product protection bears the burden of proving that the doctrine applies. See e.g. *Verizon California Inc. v. Ronald A. Katz Tech. Licensing, L.P.*, 266 F.Supp.2d 1144, 1148 (C.D. Cal. 2003).

As BNSF describes them, the Hart documents fall into four specific categories: (i) BNSF's litigation roadmap; (ii) evidence preservation guidelines; (iii) BNSF's Law Department File System Expectations ("LDFS Expectations"), and; (iv) Hart's 2016 performance review.

### i. BNSF's Litigation Roadmap

BNSF argues that its litigation roadmap is attorney-client and work-product privileged. As described by BSNF's senior general counsel, James Roberts, the litigation roadmap is a litigation resource for BNSF's counsel and their agents, including claims department employees. Prepared at the direction of BNSF's general counsel, the litigation roadmap establishes BNSF's internal litigation deadlines and other case management protocols applicable to BNSF's outside

counsel. The litigation roadmap also details internal BNSF legal strategy processes that would be valuable to attorneys suing BNSF. (Doc. 154-7, at 4).

BNSF contends that Hart copied and pasted its litigation roadmap into several of the "goal" documents he prepared and conveyed to Wooten's counsel. In particular, BNSF claims that portions of its litigation roadmap are found within the three Hart documents used by Wooten's counsel at Ahern's deposition. Hart testified at his deposition that he may have lifted material directly from the litigation roadmap into these documents and could not identify any original content that he created. (Doc. 154-1, at 102).

Wooten argues it is an overstatement to say that Hart conveyed BNSF's litigation roadmap to Wooten's counsel. According to Wooten, what Hart *did* provide were goal document that he prepared for the claims department that allegedly contained *portions* of the litigation roadmap. (Doc. 171, at 20). Even assuming the litigation roadmap is privileged, which Wooten disputes, Wooten argues the fact that Hart may have used privileged information to create the goal documents does not mean that the goal documents are privileged.

ii.     Evidence Preservation Guidelines

Hart also drafted goals for Evidence Preservation Field Representatives and Managers of Evidence Preservation. (Doc. 76, at 156-163; Doc. 154-7, at 6-7; 154-1, at 80-84). According to BNSF, these goal documents include BNSF's evidence

preservation guidelines, which speak to BNSF's legal strategy on effective investigations, including deadlines, as well as evidence collection, chain of custody, and preservation procedures. (Doc. 76, at 154-160). BNSF argues that its evidence preservation and investigation strategies are work-product privileged.

In response, Wooten argues that the Law Department Guide, which is the source of the Evidence Preservations Guidelines challenged here, is not truly privileged information. As Wooten reads it, the Law Department Guide is a general policy of how BNSF approaches litigation, does not give legal assistance on any specific issue, and was not prepared in anticipation of litigation. Regardless, Wooten points out that his counsel did not use these particular Hart documents at Ahern's deposition, so to the extent the Montana ethics opinion discussed below applies, it has not been violated with respect to these documents.

### iii.   BNSF's LDFS Expectations

Hart also conveyed BNSF's LDFS Expectations to Wooten's counsel, both as a stand-alone document and incorporated into two goal documents: (1) BNSF General Claims Department 2014 Goal Period – Senior Claim Representative and Assistant Manager and (2) BNSF General Claims Department 2015 Goal Period – Manager. (Doc. 76, at 164-65, 173, 190). Wooten's counsel used the 2014 Goal Period document at Ahern's deposition. (Doc. 46-5, at 8).

BNSF's Law Department Filing System its proprietary electronic claims filing system. (Doc. 154-7, at 8). The LDFS Expectations govern evidence collection and file management, including deadlines and procedures to assist outside counsel's handling of a case. (Doc. 154-7, at 8-9).  BNSF argues that because its LDFS Expectations were prepared in anticipation of litigation and as legal advice, they are attorney-client and work-product privileged, as are the goal documents Hart prepared and conveyed to Wooten's counsel.

In response, Wooten argues the LDFS Expectations are not privileged work product because BNSF has not shown that they were prepared in anticipation of litigation. Even if they were, Wooten argues the information is no longer privileged to the extent Hart incorporated it into the goal documents he conveyed to Wooten's counsel.

### iv.    Hart's Performance Review

Hart conveyed his 2016 BNSF Performance Review to Wooten's counsel. (Doc. 76-1, at 204-19). BNSF provided Hart with his performance review as required by state law, and argues it contains attorney-client privileged commentary reflecting BNSF's litigation strategy. In particular, BNSF notes that the performance review documents Hart's efforts to "[p]ositively impact payout, filings, and increasing outside counsel's ability to provide a qualify defense and prepare cases for trial rather than settlement," such as cancelling venue and case

handling agreements and changing BNSF's messaging around non-malignant asbestos cases. (Doc. 76-1, at 209). In addition, commentary on the review refers to the "unique challenge" BNSF faces in asbestos litigation. (Doc. 76-1, at 209).

In response, Wooten argues that Hart's performance review simply cannot be claimed as privileged because under Oregon law, current or former employees are entitled to access their personnel records. Wooten argues Hart's performance review is not privileged because it was available to him even after his employment with BNSF had ended, at which point BNSF would not have had any authority to give or withhold permission to disclose his performance review or its contents.

(b)     *Confidential and Proprietary Information*

BNSF argues that in addition being privileged, virtually all of the Hart documents contain confidential and proprietary BNSF information. BNSF maintains that the vast majority of these documents were stored on internal BNSF systems, were password protected, were accessible only by limited BNSF personnel, and were not widely or publicly available. BNSF states that if Wooten had sought any of this information through discovery, it would have objected to production and sought a protective order. BNSF accuses Wooten's counsel of using the Hart documents to circumvent the discovery process, thereby undermining BNSF's right to oppose production and the Court's role to supervise discovery.

(c)     *Waiver*

Even assuming the Hart documents were privileged, and to the extent they contain confidential and proprietary information, Wooten argues that BNSF has waived any privilege or objection by serving Hart with a subpoena for the documents. (See Doc. 171, at 23 for this argument).  Wooten notes that under Fed. R. Civ. P. 45(d)(3)(iii), a party may not use a subpoena to obtain privileged or otherwise protected material. Wooten argues the flip side of this rule is that when a party serves a subpoena on a non-party individual, that party may be deemed to have waived any claim of privilege over the documents sought. Wooten maintains that by serving Hart with a subpoena for the documents at issue, BNSF effectively demanded that he produce those documents to Wooten and his counsel, thereby waiving any privilege.

Contrary to Wooten's argument, the voluntary disclosure doctrine does not apply. BNSF served the subpoena in an attempt to recover documents that had been misappropriated by Hart and turned over to its litigation adversaries. In doing so, BNSF did not waive any privilege attached to those documents. Even if Wooten's argument had any merit, BNSF points out that the Oregon court quashed the subpoena and it never turned any documents over to Wooten voluntarily. Because BNSF did not voluntarily disclose privileged, proprietary, or confidential material, it did not waive any privilege attached to those documents.

3.      Propriety of Sanctions

By and large, the Court agrees with BNSF that there is a good argument to be made that many of the Hart documents were privileged, and/or contained proprietary and confidential information. But for purposes of addressing BNSF's current motion, the Court need not determine the privileged or protected status of the Hart documents.  Regardless of whether the Hart documents are privileged, BNSF argues sanctions are appropriate because Wooten's counsel violated professional ethics rules.

In particular, BNSF contends Wooten's counsel violated Montana Ethics Opinion 951229 by using the misappropriated BNSF documents without providing notice to BNSF or the Court. (Doc. 154, at 16). This Opinion addressed a fact pattern involving a defense attorney who hired a private detective to monitor plaintiffs who filed a personal injury suit. The attorney instructed the detective not to contact the plaintiffs under a pretext. Ignoring those instructions, the detective learned after engaging the plaintiffs in a conversation under a pretext that they both had preexisting injuries and relayed that information to the attorney. (Doc. 154-4).

The Opinion established a two-step procedure for attorneys to follow when they receive information about an opposing party as a result of improper conduct by an independent contractor or agent. "First, the attorney must notify opposing counsel that he has received information which will require judicial review before

the extent of its use can be determined." (Doc. 154-4, at 3-4). Second, the attorney must not use "the information until a definitive resolution of the proper disposition of the materials is obtained from a court." (Doc. 154-4, at 3-4). BNSF notes that the Opinion did not turn on the status of the information, and argues this two-step process applies here regardless of whether or not the Hart documents are privileged or confidential.

Wooten's response is twofold. First, Wooten argues the rule set forth in the Opinion does not apply here because it addressed a specific and distinguishable fact pattern. While the fact pattern may be distinguishable in some respects, the Opinion applies more broadly and establishes a two-step procedure that must be followed where, as here, an attorney receives an opposing party's internal information as a result of an agent's improper conduct.

Even assuming the Opinion applies, Wooten argues his counsel complied with the two-step procedure as soon as he became aware of it. Wooten explains that as soon as his counsel discovered the Opinion after Ahern's deposition, he provided all of the Hart documents to BNSF's counsel and began preparing a motion to bring those documents to the attention of the Court. But before Wooten filed that motion, BNSF filed its first Motion for Protective Order and Sanctions related to the Hart documents. Instead of filing a separate motion, Wooten

addressed the proper disposition of the Hart documents in his brief in response to BNSF's motion.

But the fact remains that Wooten's counsel used internal BNSF documents at Ahern's deposition that he knew or reasonably should have known were misappropriated by Hart, without providing notice to BNSF or the Court. Regardless of whether or not the Hart documents are confidential and privileged, Wooten's counsel effectively circumvented the federal discovery rules by acquiring and using those documents at Ahern's deposition without notice to BNSF or the Court.

Under its inherent authority and in the exercise of its discretion, the Court finds that some sanction is warranted based on Wooten's counsel's use of the Hart documents at Ahern's deposition. The Court finds that the minimum sanction necessary to deter similar conduct in the future is to prohibit Wooten from introducing any of the Hart documents from this point forward in this litigation. Accordingly, to the extent BNSF asks the Court to sanction Wooten by prohibiting him from using the Hart documents in this litigation, its motion is granted.

BNSF also asks the Court to (1) impose monetary sanctions; (2) award BNSF its attorney fees and costs incurred filing this motion; and (3) disqualify Wooten's counsel, or alternatively, order the deposition of Wooten's counsel and require in camera inspection of documents and communications exchanged

between Hart and Wooten's counsel. The Court finds that these sanctions are too severe under the circumstances, and denies this aspect of BNSF's motion.

To the extent BNSF also seeks sanctions in the form of an order directing Wooten's counsel to return all of the misappropriated documents to BNSF and prohibiting him from disseminating and/or using the documents in future litigation, the Court will defer ruling. Whether such additional sanctions are warranted is better addressed at the time of trial.

### C. BNSF's Motion for Protective Order Regarding the Deposition of Litigation Paralegal Linda Harvey (Doc. 162)

BNSF moves for a protective order pursuant to Fed. R. Civ. P. 26(c) to prevent Wooten from deposing its in-house litigation paralegal Linda Harvey.

During the course of discovery, Wooten asked BNSF to produce, in one form or another, email correspondence relating to the termination of his employment and/or his August 2, 2015 injury report. Dissatisfied with BNSF's responses, Wooten filed a motion to compel which the Court addressed at a motion hearing on February 22, 2018. To address Wooten's concerns, the Court ordered that BNSF provide a declaration from the individual responsible for producing the email correspondence that all relevant documents had been produced, subject to the attorney-client privilege and work-product doctrine. (Doc. 137, at 21-24). The Court indicated that if following review by Wooten's expert he still had concerns

as to whether the complete email strings and attachments had been produced, it would allow Wooten to depose the individual responsible for producing them.

BNSF identified Harvey as the person most knowledgeable regarding the email production and provided Wooten with Harvey's declaration. Harvey described the steps she took to secure the relevant documents and certified that to the best of her knowledge, all emails, including the full email strings and attachments, saved to the Sharepoint database were either produced to Wooten's counsel or identified on a privilege log. (Doc. 163-1).

BNSF argues Wooten has failed to demonstrate a legitimate basis for depositing Harvey, and the scope of the deposition as set forth by Wooten's counsel includes topics that are far beyond anything contemplated by the Court at the February 22, 2018, hearing. BNSF further contends that allowing Harvey's deposition would require the violation of the attorney-client privilege and work product doctrine.

In response, Wooten maintains Harvey's declaration is not sufficient because, among other things, it does not state which BNSF custodians of emails she obtained evidence from, when she contacted them, what direction or technical assistance BNSF provided to those custodians. (Doc. 176, at 5). Wooten further contends the Harvey declaration fails to properly authenticate the email, email strings, and attachments provided by the railroad. (Doc. 176, at 12). As a result,

Wooten notified BNSF in early April 2018 that it intended to depose Harvey. Wooten makes clear that he is not seeking to discover emails that are subject to the attorney-client or work product privilege, but is simply attempting to discover whether BNSF has produced all relevant emails, email strings, and attachments.

Having considered the parties' arguments, and for the reasons discussed at the motion hearing on May 21, 2018, the Court will allow Wooten to depose Harvey. The deposition shall not exceed two hours in length, and must be taken on or before June 1, 2018.

### D. Plaintiff's Motion for Protective Order Precluding the Depositions of Greg Smith, Nick Palicz, and Rusty Weber (Doc. 181).

On May 8, 2018, approximately three months after the close of discovery, BNSF noticed the depositions of Greg Smith, Nick Palicz, and Rusty Weber. Wooten argues BNSF has not established good cause for extending the discovery deadline and allowing these depositions. BNSF has already deposed Smith once, and the Court agrees that BNSF has not shown good cause for deposing him a second time more than three months after the close of discovery.

While BNSF has known about Smith for several months, BNSF argues it only recently uncovered the identity and whereabouts of Palicz and Weber because Wooten was not forthcoming in discovery. BNSF argues that Wooten failed to produce his phone records in response to BNSF's discovery requests, and claims it

has evidence showing that Wooten deleted text messages from his phone. Based in large part on what it learned from Smith, BNSF has reason to believe that Palicz and Weber know something about Wooten's activities in the days prior to his alleged work injury. Because the parties dispute whether Wooten was injured on the job or before reporting to work on July 31, 2015, the time period before his work shift is of central importance to this case. In addition to arguing that it should be allowed to Palicz and Weber, BNSF maintains that Wooten should be compelled to produce his cell phone for inspection by BNSF.

As discussed at the motion hearing on May 21, 2018, BNSF's motion to compel the forensic examination of Wooten's cell phone is denied. But because BNSF has established good cause, the Court will allow BNSF to depose Palicz and Weber. The depositions okshall each be limited to no more than two hours in length, and must be taken or before June 1, 2018.

## IV.  Conclusion

For the reasons set forth above,

IT IS RECOMMENDED that:

(1) The parties' Cross-Motion for Partial Summary Judgment on Plaintiff's FRSA claim (docs. 99 &105) be DENIED.

(2) BNSF's Motion for Summary Judgment on Plaintiff's LIA claim (doc. 102) be DENIED.

The parties are advised that pursuant to 28 U.S.C. § 636, any objections to these findings and recommendation must be filed on or before June 4, 2018. *See United States v. Barney*, 568 F.2d 134, 136 (9th Cir. 1978) (the court need not give the parties the full statutory period set forth in 28 U.S.C. § 636(b)(1) within which to file objections).

IT IS ORDERED that:

(1) Plaintiff's Motion for Discovery Sanctions based on the spoliation of evidence (doc. 115) is DENIED, except to the extent that Plaintiff may introduce evidence at trial surrounding the alleged spoliation of locomotive videos. And if BNSF has the SD card for the camera used by Ahern, it must produce that SD card by June 1, 2018.

(2) BNSF's Supplemental Motion for Protective Order and Sanctions (doc. 153) is GRANTED to the extent that Wooten is prohibited from introducing the Hart documents at trial or otherwise using them in this litigation. BNSF's motion is DENIED in all other respects.

(3) BNSF's Motion for Protective Order Regarding the Deposition of Litigation Paralegal Linda Harvey (doc. 162) is DENIED, but the deposition shall not exceed two hours in length, and must be taken on or before June 1, 2018.

(4) Plaintiff's Motion for Protective Order Precluding the Depositions of Greg Smith, Nick Palicz, and Rusty Weber (doc. 181) is GRANTED as to Smith,

but DENIED as to Palicz and Weber. The depositions of Palicz and Weber shall each be limited to no more than two hours in length, and must be taken on or before June 1, 2018.  BNSF's motion to compel the forensic examination of Wooten's cell phone is denied.

DATED this 29th day of May, 2018.

Jeremiah C. Lynch
United States Magistrate Judge