IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION



FILED

APR 23 2019

Clerk, U.S. Courts
District Of Montana
Missoula Division

ZACHARY WOOTEN,

        Plaintiff,

vs.

BNSF RAILWAY COMPANY, a
Delaware corporation,

        Defendant.

CV 16–139–M–DLC

ORDER

Pending before the Court are the following post-trial motions: Plaintiff
Zachary Wooten's Motion for Amended Judgment (Doc. 296), Motion for
Attorney's Fees and Non-Taxable Costs (Doc. 301), and Defendant BNSF Railway
Company's ("BNSF") Renewed Motion for Judgment as a Matter of Law, Motion
for New Trial, to Alter or Amend Judgment, and Remittitur, and Request for Oral
Argument (Doc. 307). For the following reasons, BNSF's various motions are
denied in their entirety and Wooten's motions are granted in part and denied in
part.

## DISCUSSION

Wooten was unlawfully terminated by BNSF on September 29, 2015 in
retaliation for his report of an on-the-job injury. Wooten brought this action

against BNSF alleging violations of the Federal Employers' Liability Act
("FELA"), the Locomotive Inspection Act ("LIA"), and the Federal Rail Safety
Act ("FRSA"). (Doc. 1 at 3–12.) On November 5, 2018, after an eleven-day trial,
the jury found that BNSF had not violated the LIA but that it had violated FELA
and FRSA. (Doc. 289 at 1–5.) The jury found that Wooten was partially
responsible for his injuries under FELA and assigned to him 25% contributory
negligence. (*Id.* at 2–3.) The jury awarded Wooten damages in the amount of
$17,570 for lost wages and benefits up to the date of trial, which the Court reduced
by 25% in order to reflect Wooten's contributory negligence for a total award of
$13,177.50. (Docs. 289 at 3; 293 at 1.) On his FRSA claim, the jury awarded
Wooten $1,407,978 in lost wages and benefits in the future, reduced to present
value, and $500,000 for his mental and emotional humiliation or pain and anguish.
(Doc. 289 at 3–4.) Additionally, after finding that BNSF's conduct was malicious
or in reckless disregard for Wooten's rights, the jury awarded Wooten $249,999 in
punitive damages. (Docs. 289 at 4; 291 at 1.)

Because the determination of BNSF's motions could render Wooten's
requests moot, the Court begins its analysis with BNSF's various ascriptions of
error. BNSF first renews its motion for judgment as a matter of law on Wooten's

FRSA claim before advancing its alternative arguments for a new trial or remittitur of damages.

## I. BNSF's Motions for Judgment as a Matter of Law, New Trial, or Remittitur

### A. Judgment as a Matter of Law

Pursuant to Federal Rule of Civil Procedure 50(a)(1) judgment as a matter of law is appropriate if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." BNSF made its original motion at the close of Wooten's case-in-chief and appropriately renewed that motion pursuant to Rule 50(b). Judgment as a matter of law is "proper if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). "The verdict will be upheld if it is supported by substantial evidence, 'even if it is also possible to draw a contrary conclusion.'" *First Nat'l Mortg. Co. v. Fed. Realty Inv. Tr.*, 631 F.3d 1058, 1067 (9th Cir. 2011) (quoting *Pavao*, 307 F.3d at 918).

The Court's analysis of BNSF's arguments on Wooten's FRSA claim are aided by recent clarifications provided by the Ninth Circuit after the jury rendered its verdict in this case: *Rookaird v. BNSF Railway Co.*, 908 F.3d 451 (9th Cir.

2018), and *Frost v. BNSF Railway Co.*, 914 F.3d 1189 (9th Cir. 2019). A FRSA

complaint proceeds in two stages, the prima facie stage and the substantive stage.

*Rookaird*, 908 F.3d at 459 (citing 49 U.S.C. § 42121(b)(2)(B); 29 C.F.R.

§§ 1982.104(e), 1982.109(a)–(b)). Both stages are governed by a burden-shifting

framework allowing the employer to defeat the employee's claim by showing "by

clear and convincing evidence, that the employer would have taken the same

unfavorable personnel action in the absence of [the protected activity]." 49 U.S.C.

§ 42121(b)(2)(B)(ii), (iv); *Rookaird*, 908 F.3d at 459–60. As articulated in

*Rookaird*, the prima facie showing has four elements:

> [1] The employee engaged in a protected activity (or . . . was
> perceived to have engaged or to be about to engage in protected
> activity);
> [2] The respondent knew or suspected that the employee engaged in
> the protected activity (or perceived the employee to have engaged or
> to be about to engage in protected activity);
> [3] The employee suffered an adverse action; and
> [4] The circumstances were *sufficient to raise the inference that* the
> protected activity (or perception thereof) was a contributing factor in
> the adverse action.

*Rookaird*, 908 F.3d at 460 (quoting 29 C.F.R. § 1982.104(e)(2)) (emphasis in

original). If the plaintiff succeeds at the prima facie stage, he proceeds to the

substantive stage where a violation will only be found if he can demonstrate by a

preponderance of the evidence that any protected activity was a contributing factor

to the unfavorable personnel action. *Id.*; 49 U.S.C. § 42121(b)(2)(B); 29 C.F.R. § 1982.109(a).

BNSF argues that judgment as a matter of law is warranted in this case because Wooten failed to prove both "the knowledge" and "contributing factor" elements and, additionally, BNSF proved the "same action affirmative defense." As pointed out by Wooten, this is the fifth iteration of BNSF's arguments and, for the following reasons, the Court again finds those arguments unpersuasive.

### i. The knowledge element

BNSF argues that there is no evidence that "the BNSF decision-makers knew Plaintiff submitted a personal injury report in good faith." (Doc. 308 at 7.) BNSF claims that the testimony elicited from the BNSF decision-makers at trial, Director of Labor Relations Kathleen Maglisceau and then-General Manager Dan Fransen, shows only that "[a]ll they knew was that Plaintiff had some injury before coming to work and this was amply supported by their assessment of what the crew shanty videos showed." (*Id.* at 8.)

BNSF's argument is unconvincing. Wooten only needed to show that BNSF, not Maglisceau or Fransen specifically, "knew or suspected" that Wooten had engaged in protected activity by reporting his injury. *Rookaird*, 908 F.3d at 460 (quoting 29 C.F.R. § 1982.104(e)(2)). And, despite BNSF's generous

characterization of Maglisceau's and Fransen's testimony, the Court cannot be convinced that the evidence supports BNSF's argument that either "knew Plaintiff had some injury before coming to work." Both Maglisceau and Fransen presented as overly biased and unreliable. The Court is convinced that there was substantial evidence showing the BNSF at least suspected that Wooten's report was made in good faith.

### ii. The contributing factor element

Next, BNSF argues that Wooten failed to satisfy the contributing factor element of his claim because he offered neither "evidence demonstrating hostility towards employees who notified BNSF of a personal injury" nor "evidence the decision-makers lied about the reason for the dismissal." (Doc. 308 at 9–10.) BNSF asserts that Wooten improperly "relied" on the "ICP system-wide bonus to prove intentional retaliation" and "James Pino's PMP" to show intentional retaliation and that neither conclusively demonstrated retaliatory intent. (*Id.* at 9.) BNSF states that its "good faith belief [that] Wooten engaged in misconduct is dispositive on contributing factor." (*Id.* at 11.)

In its argument, BNSF focuses on Wooten's proof on the contributing factor element, and overlooks the flaws in its own evidence on this subject. The testimony of the BNSF employees who reviewed Wooten's case showed that they

latched on to an early-formed presumption that Wooten was being dishonest that jaded their treatment of Wooten throughout. As previously stated, Maglisceau and Fransen presented as biased and unreliable. Although BNSF decries any reliance on Pino, his testimony claiming that he believed Wooten to have been previously injured and dishonest—which informed the perspective of the "decision-makers"—was both inconsistent and lacking in credibility. In summary, the evidence presented at trial fell far short of proving that BNSF had an "honest" or "good faith" belief that Wooten was being dishonest.

"A contributing factor is any factor, which alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Frost*, 914 F.3d at 1195 (internal quotation marks and citation omitted). The jury's finding that Wooten established the contributing factor element is supported by sufficient evidence and BNSF has failed to show that the evidence "construed in the light most favorable to [Wooten], permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao*, 307 F.3d at 918.

### iii. The same action affirmative defense

BNSF's final argument for judgment as a matter of law is that it "proved by clear and convincing evidence it would have taken the same unfavorable personnel action absent Plaintiff's protected activity." (Doc. 308 at 11.) BNSF states that

dishonesty is a "stand-alone dismissible offense," it followed its internal investigation and discipline procedures, and "disinterested individuals" reviewed and approved of Wooten's dismissal. (*Id.* at 12.) Further, BNSF asserts that it consistently disciplines employees for dishonesty "absent any injury report" and "does not discipline the vast majority of employees who report injuries." (*Id.*)

BNSF unsuccessfully made these exact same arguments to the jury during trial. BNSF repeatedly claimed that it would have terminated Wooten for being dishonest but points to no dishonesty outside of the report itself. Weighing the evidence, the jury reasonably concluded that BNSF's accusations of dishonesty were hollow. Additionally, the jury weighed BNSF's claims that it routinely terminates dishonest employees against Wooten's evidence that BNSF had not fired numerous employees who had been found to be dishonest, one of whom had been dishonest in reporting an injury. Clear and convincing evidence is a heavy burden. The Court is satisfied that, when construed in the light most favorable to Wooten, the jury's determination that BNSF failed to carry its burden was a reasonable conclusion.

**B. New Trial**

Following a jury trial, a court "may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been

granted in an action at law in federal court." Fed. R. Civ. P. 59(a). A new trial may be granted "even though the verdict is supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *Roy v. Volkswagen of America, Inc.*, 896 F.2d 1174, 1176 (9th Cir. 1990) (internal quotation marks and citation omitted).

BNSF advances numerous arguments in support of its request for a new trial which the Court addresses in turn.

### i. Failure to Bifurcate

BNSF asserts that it suffered significant prejudice as a result of the Court's decision not to bifurcate the trial of Wooten's FRSA claim from the trial on his FELA and LIA claims and the further bifurcation of those claims from the trial on "issues of punitive damages." (Doc. 308 at 13–15.) BNSF complains that the jury was exposed to "FELA/LIA-related evidence" that had "zero relevance to the FRSA case" which "unduly influenced the jurors in their assessment" of the FRSA claim. (*Id.* at 14.) Further, BNSF claims that the Court failed in its obligation to provide limiting instructions to the jury that would have reduced the prejudice. (*Id.* at 14.)

The decision on whether or not to bifurcate trial for any of the reasons provided in Federal Rule of Civil Procedure 42(b) is within the broad discretion of the trial court. In fact, "Rule 42(b) merely *allows*, but does not require, a trial court to bifurcate cases in furtherance of convenience or to avoid prejudice." *Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004) (internal quotation marks omitted). Pre-trial, United States Magistrate Judge Jeremiah C. Lynch denied BNSF's motion to bifurcate. BNSF objected to Judge Lynch's order and this Court overruled that objection, agreeing with Judge Lynch that any possibility of prejudice can be reduced or eliminated by the use of limiting instructions to the jury. (Doc. 237 at 4.) Additionally, the Court found that the factors of Rule 42(b), considerations of convenience, expeditiousness, and judicial economy, all "weigh heavily in favor of trying this case at one fell swoop." (*Id.*)

Looking back on the issue after an eleven-day trial, the Court is reaffirmed in its previous decision—significant overlap existed in the evidence relevant to the various claims advanced by Wooten which, in this Court's view, greatly increased the benefit of trying all claims together. Moreover, the Court is not convinced that the combined trial was particularly prejudicial to BNSF or that the jury was incensed by undefined "[p]unitive testimony." (Doc. 308 at 15.) The claims advanced by Wooten are not as complicated and easily confused as BNSF asserts.

Additionally, the jury was given both limiting and curative instructions, just not the unnecessarily redundant limiting instructions BNSF requested. (*See* Doc. 284 at 7, 15, 23.) BNSF is not the victim of a miscarriage of justice as a result of Wooten's claims being tried together.

### ii. The Collective Bargaining Agreement

BNSF next argues that it is entitled to a new trial because Wooten argued during trial that "the collectively bargained procedures were unfair, and that this unfairness represented a 'rush to judgment' demonstrating retaliatory intent." (Doc. 308 at 15.) BNSF claims that Wooten's arguments caused the jury to act as a "super-personnel department" that decided the case based upon its finding that the "CBA-governed discipline process" was unfair. (Doc. 320 at 6.) However, as pointed out by Wooten, BNSF has failed to identify any specific instance of when this argument was advanced. Throughout trial, the general argument advanced by Wooten was that BNSF treated him unfairly by discriminating against him for the filing of his injury report. This argument is distinct from an argument that the discipline process itself is flawed and unfair. BNSF puts much stock in its internal procedures and safeguards designed to prevent discrimination while failing to recognize that these checks are only as effective as the people enforcing them. Here, Wooten successfully argued that the people, not the process, treated him

-11-

unfairly by retaliating against him after he filed his injury report. Again, BNSF
has not suffered a miscarriage of justice.

### iii. Jury Instructions

"[E]rroneous jury instructions . . . are bases for a new trial." *Murphy v. City
of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990). "'Jury instructions must be
formulated so that they fairly and adequately cover the issues presented, correctly
state the law, and are not misleading.'" *Gilbrook v. City of Westminster*, 177 F.3d
839, 860 (9th Cir. 1999) (quoting *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir.
1996)). "Whether an instruction misstates the law . . . is a legal issue reviewed de
novo." *Galdamez v. Potter*, 415 F.3d 1015, 1021 (9th Cir. 2005). If a jury is
erroneously instructed, prejudice is presumed "and the burden shifts to the
[opposing party] to demonstrate 'that it is more probable than not that the jury
would have reached the same verdict' had it been properly instructed." *Id.* at 1025
(quoting *Obrey v. Johnson*, 400 F.3d 691, 701 (9th Cir. 2005)).

BNSF claims various errors in the giving of jury instructions warrant a new
trial in this case.

### a. Intentional Retaliation Instruction

BNSF claims that the Court's instruction on the contributing factor element
was erroneous because it stated, in part, that "Wooten is not required to

-12-

conclusively demonstrate BNSF's retaliatory motive but he is required to show that

retaliation played at least some role in BNSF's decision." (Doc. 308 at 17–18.)

Citing *Rookaird*, BNSF argues that the Court's instruction included language

"relevant only to a *prima facie* case" and is "reversible error." (*Id.* at 18.)

In full, the instruction given to the jury states:

> A "contributing factor" is any factor which, alone or in connection
> with other factors, affected the outcome of BNSF's personnel decision
> regarding Wooten in any way. Wooten is not required to conclusively
> demonstrate BNSF's retaliatory motive but he is required to show that
> retaliation played at least some role in BNSF's decision. The
> contributing factor standard may be satisfied by circumstantial
> evidence, which may include temporal proximity, indications of
> pretext, inconsistent application of the employer's policies, shifting
> explanations for the employer's actions, antagonism or hostility
> toward a complainant's protected activity, the falsity of an employer's
> explanation for the adverse action, or a change in the employer's
> attitude toward the complainant after he engaged in the protected
> activity. Neither temporal proximity nor evidence of BNSF's
> compensation program nor mere factual connection between protected
> activity and adverse employment action is sufficient, standing alone,
> to establish contributing factor.

(Doc. 284 at 27.) Additionally, the jury was instructed that Wooten had to prove

"that his protected activity was a contributing factor to his termination" by a

preponderance of the evidence. (*Id.* at 25.) The jury was further instructed on

what the preponderance of the evidence burden of proof requires. (*Id.* at 2.) The

Court is satisfied that these instructions fairly and adequately cover the issues

presented, correctly state the law, and are not misleading. *Gilbrook*, 177 F.3d at 860.

As the Ninth Circuit further clarified in *Frost*, "the only burden the statute places on FRSA plaintiffs is to ultimately prove, by a preponderance of the evidence, that their protected conduct was a contributing factor to the adverse employment action—i.e., that it tended to affect the decision in some way." 914 F.3d at 1195 (internal quotation marks, citations, and alteration omitted). A contributing factor is "any factor, which alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Rookaird*, 908 F.3d at 461 (internal quotation marks omitted). "[A]lthough the FRSA's prohibition on discriminating against an employee ultimately requires a showing of the employer's discriminatory or retaliatory intent, FRSA plaintiffs satisfy that burden by proving that their protected activity was a contributing factor to the adverse employment decision." *Frost*, 914 F.3d at 1196 (internal quotation marks and alteration omitted). The complained of instruction tracks this directive precisely.

Notwithstanding BNSF's assertions to the contrary, what constitutes a contributing factor between the prima facie and substantive stages of a FRSA case does not change, only the burden of proof does. As emphasized by the Ninth Circuit, showing that "the circumstances are sufficient to raise the inference of $x$ is

-14-

a lower bar than proving *x* by a preponderance of the evidence." *Rookaird*, 908 F.3d at 460. However, this does not mean that *x* changes. "There is no requirement, at either the prima facie stage or the substantive stage, that a plaintiff make any additional showing of discriminatory intent." *Frost*, 914 F.3d at 1196.

### b. Honest Belief/Business Judgment Instruction

BNSF next argues that the Court should have given an instruction stating that "BNSF cannot be held liable for Zachary Wooten's FRSA claim if you conclude that BNSF honestly believed Wooten engaged in the misconduct for which BNSF states he was disciplined." (Doc. 308 at 18.) This instruction is the exact instruction deemed inconsistent with the FRSA in *Frost*. 914 F.3d at 1196–97. The Court is satisfied that the instruction proposed by BNSF would, itself, be a misstatement of the law liable to mislead the jury "to skirt the actual issue" of whether Wooten's injury report affected BNSF's decision in any way. *Id.* at 1197. The Court instructed the jury on what BNSF needed to show in order to prove its affirmative defense and BNSF attempted throughout trial to meet that burden by showing that it honestly believed Wooten was lying and would have terminated his employment in the absence of any injury report. (Doc. 284 at 25.) Even if the instruction were not a misstatement of the law, it is unnecessary following an instruction on BNSF's affirmative defense.

### c. Decision-Maker Knowledge Instruction

BNSF asserts that the Court should have given an instruction focusing the jury "specifically on the decision-makers' knowledge of a good faith protected activity." (Doc. 308 at 19.) BNSF claims that the relevant inquiry in an FRSA case is "whether the decision-makers knew about (and thus could have considered) Plaintiff's good faith protected activity." (*Id.*) BNSF complains that the absence of such an instruction allowed the jury to focus on "the formal investigation, and [the] attack on Pino." (Doc. 320 at 9.) BNSF cites *Conrad v. CSX Transportation, Inc.*, 824 F.3d 103, 108 (4th Cir. 2016), in support of its position that Wooten needed to prove that the decision-makers knew Wooten engaged in protected activity in good faith. (Doc. 308 at 19.)

BNSF's misconstrues *Conrad* in an effort to support its position. The Court in *Conrad* held only that the decision-makers needed to know that the employee had engaged in a protected activity. 824 F.3d at 108. The requirement that an employer punishing an employee needs to know that the employee had engaged in protected activity is inescapable if the employer is going to be held liable for retaliating against that employee for the protected activity. However, BNSF attempts to impose an additional burden on the FRSA plaintiff by requiring that he show that the decision-maker knew the activity was done in good faith. This

additional requirement is unsupported and untenable in the face of the purpose

behind the FRSA. BNSF's proposed instruction would allow the termination of an

employee for engaging in protected activity if some remote decision-maker is

unsure of whether it was done in good faith. The FRSA only requires that Wooten

show that BNSF "knew or suspected" the he engaged in protected activity.

*Rookaird*, 908 F.3d at 460 (quoting 29 C.F.R. § 1982.104(e)(2)). The Court so

instructed the jury.[1] (Doc. 284 at 25.)

### d. Affirmative Defense Instruction

BNSF claims that it was entitled to an instruction putting its affirmative

defense "in context." (Doc. 308 at 20.) BNSF provides no support for its position

that the Court's decision not to give a contextual instruction is reversible error.

The Court declines to address BNSF's legally inadequate argument. The jury was

properly instructed on BNSF's affirmative defense. (Doc. 284 at 25.)

### e. Good Faith Efforts Instruction

BNSF's last challenge regarding the instructions given to the jury is that the

Court should have given an instruction consistent with *Kolstad v. American Dental

Ass'n*, 527 U.S. 526 (1999), that would allow BNSF to escape punitive damage

liability if it "undertook good faith efforts by having policies in place to prevent

---

[1] Moreover, it is undisputed that the decision-makers in this case knew that Wooten had filed an injury report. It is BNSF's assertion that it believed he had lied on that report which brought about this litigation.

retaliation." However, BNSF can point to no controlling authority to support its position that *Kolstad*, a Title VII case, is applicable to this FRSA case. Although the FRSA's whistleblower provision explicitly provides for punitive damages, it does not specify the standard for awarding those damages. 49 U.S.C. § 20109(e)(3). Accordingly, the Court instructed the jury according to the Manual of Model Civil Jury Instructions for the Ninth Circuit. BNSF has failed to show that the failure to give its requested instruction "warrants either a new trial or complete elimination of the punitive damages award." (Doc. 308 at 21.)

### iv. Evidentiary Errors

BNSF next asserts that a number of evidentiary errors warrant a new trial.[2]

### a. FRSA

BNSF claims that the Court "erroneously admitted evidence of non-similarly-situated comparators." BNSF appears to assert that comparators must be from the same division, have the same job, and be terminated by the same supervisor in order to be relevant. (Doc. 308 at 21–22.) The cases cited by BNSF in support of this position do not establish the requirements BNSF seeks. *See, e.g.*, *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) ("[I]ndividuals are similarly situated when they have similar jobs and display similar conduct.").

---

[2] The Court refrains from addressing BNSF's arguments regarding Fransen and Pino as they are wholly lacking in any form of analysis, legal or otherwise.

Accordingly, the Court declines to adopt the similarity requirements urged by BNSF. The Court is satisfied that the relevance of the comparators introduced at trial significantly outweighs the prejudicial impact they had on BNSF's case.

### b. FELA

BNSF argues that several pre-trial rulings allowed Wooten to "game[ ] the system" by concealing evidence on his cell phone that BNSF claims would have proven that Wooten suffered his injuries after drinking to excess and falling down a steep hill. (Doc. 320 at 13.) To the extent that BNSF has implicated the Court's ruling on the limits of Rusty Weber's testimony, the Court relies on its articulated reasons for limiting that testimony under Federal Rules of Evidence 403 and 613(b). Namely: (1) BNSF had not established that there was an inconsistent statement to be impeached; (2) Weber was in the throes of alcoholism and admitted that his memory could have been impaired and that he was likely drunk at the time; (3) BNSF had not established that the alleged statement of Smith to Weber was based on firsthand knowledge; (4) BNSF sought the admission of this evidence not to impeach Smith but to support BNSF's version of Wooten's injury; (5) the evidence is highly prejudicial; and (6) the evidence has little probative value as it was not information BNSF knew at the time it made its decision but is instead only an attempt to backfill its version of Wooten's injury.

-19-

Going back to the pre-trial rulings BNSF complains of, the Court denied

BNSF's motion to compel the forensic examination of Wooten's cell phone and

request for the second deposition of Greg Smith because they were filed three

months after the close of discovery and the Court determined that BNSF had not

shown good cause for deposing Smith a second time. (Doc. 236 at 6–8.) BNSF

now claims that as a result of the disclosure of billing records, BNSF "now knows

that Plaintiff's 'forensic expert' was conducting repeated testing while

simultaneously moving for a protective order." (Doc. 308 at 23.) However, BNSF

fails to connect the relevancy of its revelation with any legal reason to support a

new trial in this case other than by making a bald assertion that BNSF has

"significant concerns that a fraud has been perpetrated on the Court."[3] (Doc. 308

at 25.) The Court denied BNSF's requests as both untimely and unsupported by

good cause in September of 2018 and stands on that decision now.[4]

---

[3] The Court does not share BNSF's concern and will decline its invitation to "'conduct an independent investigation in order to determine whether it has been the victim of fraud.'" (Doc. 308 at 24 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)). The Court considers this to be an invitation to engage in a one-sided fishing expedition based upon BNSF's misplaced reliance on suspect evidence from a suspect source.

[4] The Court notes that under Rule 59 a new trial may be warranted for discovery misconduct when the movant can: "(1) prove by clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct" and "(2) establish that the conduct complained of prevented the losing party from fully and fairly presenting his case or defense." *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878–79 (9th Cir. 1990) (internal quotation marks and citation omitted). BNSF has neither noted nor met this burden.

### v. Inconsistent Verdict

BNSF's last argument for a new trial is that the jury verdict is inconsistent. BNSF asserts that it was inconsistent for the jury to find that it had not violated the LIA before finding that BNSF was negligent under the FELA. Then, BNSF asserts that it is also inconsistent for the jury to have found Wooten contributorily negligent while simultaneously finding that BNSF had violated the FRSA because, in BNSF's view, the only way the jury could have found Wooten negligent is for the jury to have found that he had a preexisting injury. (Doc. 308 at 25–26.) These arguments lack merit.

"Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355 (1962). Indeed, the jury verdict must be upheld unless it is "impossible 'under a fair reading' to harmonize the answers.'" *Magnussen v. YAK, Inc.*, 73 F.3d 245, 246 (9th Cir. 1996) (quoting *Omar v. Sea-Land Serv., Inc.*, 813 F.2d 986, 991 (9th Cir. 1987)). Here, it is far from impossible.

The Court proceeds to walk through but one possible harmonization of the jury verdict. First, the jury was asked whether Wooten had proven that BNSF had violated the LIA and the jury found that he had not. (Doc. 289 at 1.) Since the

jury was instructed that Wooten needed to prove that the complained-of door latch was "not safe to operate without unnecessary danger of personal injury," it is entirely possible that the jury was not convinced that the door latch posed such a threat. (Doc. 284 at 24.) However, the outcome in the FELA claim is not dependent on the outcome in the LIA claim, although the railroad's violation of the LIA would establish negligence per se under the FELA. *See CSX Transp., Inc. v. McBride*, 564 U.S. 685, 703 n. 12 (2011). Accordingly, the jury was not obligated to find no negligence simply because it did not find "unnecessary danger." Indeed, the jury was directed to next assess whether or not Wooten had proven that BNSF was negligent in connection with the incident. (Doc. 289 at 2.) BNSF did not need to overlook an "unnecessary danger" in order to be found negligent, the jury was instructed that negligence is the failure to use reasonable care and that reasonable care includes "failing to do something that a reasonably prudent person would have done." (Doc. 284 at 17.) Thus, it was entirely consistent for the jury to have concluded that BNSF was negligent in its maintenance of the door or its latch.

Second, the jury did not need to find that Wooten "was injured to some degree before reporting to work" in order to find Wooten contributorily negligent, as argued by BNSF. (Doc. 308 at 26–27.) Facts elicited at trial could very reasonably have been interpreted by the jury to show that Wooten was negligent

when he continued to perform his work duties after feeling and hearing the "pop" in his wrist. To be sure, an assignment of 25% responsibility to Wooten in this circumstance seems entirely reasonable and consistent with this level of negligence. Nonetheless, Wooten could have been entirely responsible for his injury at work and still notify BNSF of a work-related personal injury and still be retaliatorily discharged by BNSF in violation of the FRSA. It hardly needs to be pointed out that the jury could have logically progressed to a finding of retaliation by finding that Wooten had reported a work-related injury in good faith—that was Wooten's theory of the case from beginning to end. The jury verdict is both internally consistent and consistent with the clear weight of the evidence.

## C. Remittitur

BNSF's final argument in support of judgment as a matter of law, a new trial, or the reduction of damages is that evidence at trial was insufficient to support the jury's award of front pay, emotional distress damages, and punitive damages. (Doc. 308 at 27–35.) BNSF takes issue with both the basis for awarding these damages and the verdicts themselves. The Court addresses these arguments in turn.

To the extent that BNSF disputes the amount of any award, "a jury's award of damages is entitled to great deference." *In re First Alliance Mortg. Co.*, 471

-23-

F.3d 977, 1001 (9th Cir. 2006). In fact, the Court is obligated to uphold the jury's

finding "unless the amount is grossly excessive or monstrous, clearly not supported

by the evidence, or based only on speculation or guesswork." *Del Monte Dunes at*

*Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996).

### i. Front Pay Award

The jury awarded Wooten $1,407,978 for lost wages and benefits in the

future, reduced to present value ("front pay"), for BNSF's violation of the FRSA.

(Doc. 289 at 4.) The FRSA provides for the following relief:

(A) reinstatement with the same seniority status that the employee
would have had, but for the discrimination;
(B) any backpay, with interest; and
(C) compensatory damages, including compensation for any special
damages sustained as a result of the discrimination, including
litigation costs, expert witness fess, and reasonable attorney fees.

49 U.S.C. § 20109(e)(2). In a variety of contexts, reinstatement is considered an

equitable remedy with front pay being an equitable alternative if it would be

inappropriate to reinstate the plaintiff because there is no longer a position

available or there exists excessive hostility or antagonism between the employer

and employee. *See Teutscher v. Woodson*, 835 F.3d 936, 946 (9th Cir. 2016)

(ERISA); *Traxler v. Multnomah Cnty.*, 596 F.3d 1007, 1012 (9th Cir. 2010)

(FMLA); *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338, 1346 (9th Cir.

1987) (ADEA); *see also Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843,

846, 853 n. 3 (2001) (finding front pay to be the "'monetary equivalent of the equitable remedy of reinstatement'" but declining to establish when it is an "appropriate remedy" in Title VII cases (quoting *Blum v. Witco Chemical Corp.*, 829 F.2d 367, 383 (3d Cir. 1987)). Nonetheless, the Ninth Circuit has yet to determine whether reinstatement is an equitable or legal remedy under the FRSA and the parties, naturally, dispute the issue.[5]

Notwithstanding Wooten's arguments concerning the statutory construction of the FRSA as opposed to the FMLA, ADEA, or other statutory provisions wherein reinstatement is explicitly labeled as an equitable remedy, the Court is convinced that the safest and clearest route forward in this instance is to find that reinstatement has not been so distinctly provided for in the FRSA context that it should be considered to be a legal remedy rather than an equitable one. Particularly because, for the following reasons, the Court is not persuaded by the mere fact that reinstatement is listed as a form of relief in the FRSA.

---

[5] BNSF also asserts that the jury's decision not to award back pay on the FRSA claim shows that the jury agreed with BNSF that Wooten had failed to mitigate. The Court is not convinced there is a connection, particularly in light of the front pay award and the fact that the jury awarded back pay on the FELA claim and, thus, was precluded from awarding back pay on the FRSA claim by the express language of the verdict form itself. (Doc. 289 at 4.) Further, the back pay award is precisely the award requested by Wooten and supported by the testimony of his expert, Jeffrey Opp, which shows that the jury was not convinced that Wooten had failed to mitigate his damages. On this note, the Court finds that the overwhelming weight of the evidence shows that Wooten satisfactorily mitigated his damages.

-25-

In *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990) the United States Supreme Court stated that, "[g]enerally, an action for money damages was the traditional form of relief offered in the courts of law. This Court has not, however, held that any award of monetary relief must *necessarily* be legal relief." (internal quotation marks and citations omitted) (emphasis in original). The Court went on to state the instances in which money damages may be considered equitable. *Id.* at 570–71. The Ninth Circuit recently expanded on the instances when money damages may be considered equitable in *Bayer v. Neiman Marcus Group, Inc.*, 861 F.3d 853, 865–66 (9th Cir. 2017). The Ninth Circuit noted that, as a general rule, "monetary relief constitutes a legal remedy" but that it may be "characterized as equitable when it possesses attributes meriting an exception to the general rule." These "attributes" may be present in two contexts: (1) when the monetary award is "restitutionary in nature" or (2) when the award is "merely incidental to or intertwined with injunctive relief." *Id.* at 865–66.

When an award is restitutionary in nature, it is equitable "when it is intended 'to restore to the plaintiff particular funds . . . in the defendant's possession.'" *Id.* at 865 (quoting *Honolulu Joint Apprenticeship & Training Comm'n of United Ass'n Local Union No. 675 v. Foster*, 332 F.3d 1234, 1237–38 (9th Cir. 2003)).

Conversely, a restitutionary award may be legal "in actions that simply seek to impose general personal liability on a defendant for money allegedly owed to the plaintiff." *Id.* at 866.

Examples of when an award is "merely incidental to or intertwined with injunctive relief, so as to be considered equitable, are when: (1) "money damages in the form of back pay are . . . awarded as a complement to, rather than in addition to and distinct from, injunctive reinstatement," or (2) "when awarded in lieu of injunctive reinstatement." *Id.* "In contrast, an award of money damages to compensate for reputational injury, mental anguish, emotional distress, or loss of job responsibilities constitutes a legal remedy." *Id.*

Here, the parties are not disputing whether Wooten should be reinstated, they are disputing whether front pay is appropriate and whether it should have been determined by the Court instead of the jury. Front pay is the focus and, as distinguished in *Bayer*, front pay, although a monetary award, is considered equitable when "awarded in lieu of injunctive reinstatement." 861 F.3d at 866. The Court is satisfied that reinstatement and front pay under the FRSA are equitable remedies. *See Traxler*, 596 F.3d at 1012 ("This is a classic case where a monetary award is inextricably linked with the equitable determination regarding reinstatement."). Additionally, the Court finds that reinstatement is not appropriate

in this case because of the lapse of years since the 2015 incident and because this protracted and aggressively litigated lawsuit demonstrates significant hostility and animosity between BNSF and Wooten. Consequently, front pay is the appropriate remedy in this case. Moreover, because the Court finds front pay to be an equitable remedy under the FRSA and because the Court submitted the issue of front pay to the jury after the testimony of Wooten's forensic economist, Jeffrey Opp, the Court will treat the jury's front pay award as advisory in this case.

The jury was instructed that in order to calculate future wage loss for any claim, it should "determine the present cash value of salary, pension, and any other fringe benefits from today until the time Wooten may reasonably be expected to fully recover from the continuing effects of BNSF's conduct, decreased by any projected future earnings from another employer." (Doc. 284 at 29.) The jury was also instructed on how to determine present cash value and on the elements BNSF needed to prove in order to show a failure to mitigate. (*Id.* at 30–31.) The jury heard extensive and detailed evidence and testimony, including Wooten's forensic economist, the competing evidence on Wooten's mitigation efforts, Wooten's expressed intent of working for BNSF until retiring between the ages of 60 and 67 (like his grandfather before him), the career prospects available to Wooten, and Wooten's work-life expectancy. Opp presented a reliable mathematical process by

which the jury could calculate a reasonable award to compensate Wooten for what would have been a life-long career with BNSF and the jury's front pay award falls squarely within the "projected future lost railroad earnings" presented by Opp. (*See* Docs. 283-155 at 2; 289 at 4.) Although front pay is not intended to compensate a plaintiff for "sit[ting] idly by and . . . doing nothing," Opp's analysis took Wooten's potential earnings in his current career as an insurance salesman into account. *Cassino*, 817 F.2d at 1347 (internal quotation marks and citation omitted). BNSF is one of the best-paying jobs available to individuals with limited education in Kalispell, Montana, and Wooten loved the job and had ambitions within the company. Treating the jury's front pay award as advisory, the Court is satisfied that it is a sound award that is supported by the evidence and is not grossly excessive.

Wooten was wrongfully terminated by BNSF, cutting short what he hoped would be a lifetime career with great benefits and excellent pay. Prevailing under the FRSA entitles Wooten "to all relief necessary to make [him] whole." 49 U.S.C. § 20109(e)(1). The Court is convinced that a front pay award of $1,407,978 falls squarely within that statutory directive.

### ii. Emotional Distress Damages

The jury awarded Wooten $500,000 for mental and emotional humiliation or pain and anguish. BNSF claims that Wooten failed to prove that he suffered emotional distress and that this requires "judgment in BNSF's favor on emotional distress damages, or alternatively, remittitur or a new trial." (Doc. 308 at 29–30.) BNSF relies heavily on its contention that emotional distress damages must be supported by objective evidence. (*Id.* at 29–32.) However, in *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 513 (9th Cir. 2000), the Ninth Circuit expressly stated that it does not impose an objective evidence requirement on emotional distress damage awards. While BNSF points out that the emotional distress damages award in *Passantino* was supported by objective evidence, this argument misses the point. Giving the jury award "great deference" and viewing the evidence in the light most favorable to Wooten, the Court cannot conclude that the award is grossly excessive, monstrous, clearly unsupported by the evidence, or based only on speculation or guesswork. *First Alliance Mortg.*, 471 F.3d at 1001; *Del Monte Dunes*, 95 F.3d at 1435; *Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir. 1983). Particularly in light of the fact that Wooten came from a "railroad family" in a small "railroad town" and was wrongfully terminated and decried as a liar by the railroad. Wooten testified to the

-30-

emotional impact this had on him, and the Court found his testimony to be
compelling.

### iii. Punitive Damages

BNSF's final contention is that errors in the punitive damages award merit a

new trial, judgment as a matter of law, or the elimination or reduction of the award.

BNSF claims that the evidence does not support a punitive damages award and

that, under *Kolstad*, this entitles BNSF to judgment as a matter of law. BNSF also

claims that the Court instructed the jury on the wrong burden of proof and asserts

that Wooten needed to prove the appropriateness of punitive damages by clear and

convincing evidence.[6]  (Doc. 308 at 32–33.)

BNSF's argument for judgment as a matter of law on Wooten's punitive

damages claim, like BNSF's argument on the punitive damages instruction

addressed in Section II.C.v., above, is another attempt by BNSF to apply *Kolstad*

to the FRSA.  Again, this Court is not convinced that *Kolstad* applies in the FRSA

context.  BNSF points to the Eighth Circuit's decision in *BNSF Railway Co. v. U.S.*

*Department of Labor Administrative Review Board*, 867 F.3d 942 (8th Cir. 2017),

as establishing *Kolstad* as the standard for awarding punitive damages under the

FRSA.  For his part, Wooten cites to the First Circuit's decision in *Worcester v.*

---

[6] BNSF also argues that Wooten presented "improper argument" intended to "wrongly evoke
passion and prejudice in the award." (Doc. 308 at 34.) Because this argument is both
unsupported by authority and inadequately articulated, it will not be addressed further.

*Springfield Terminal Railway Co.*, 827 F.3d 179 (1st Cir. 2016), as establishing the standard under the FRSA in accord with *Smith v. Wade*, 461 U.S. 30 (1983). However, the Ninth Circuit has not ruled on this issue.

The Court finds the analysis of the First Circuit to be more convincing and in line with the purpose of the FRSA. The Court is not convinced that simply because BNSF had anti-retaliation safeguards in place, it should be able to avoid punitive damages under the FRSA. BNSF repeatedly emphasized its safeguards at trial but the jury nonetheless found that BNSF had retaliated against Wooten in violation of the FRSA. Inherent in this conclusion is the finding that BNSF's safeguards did not prevent discrimination in this case. In other words, BNSF's safeguards are ineffective. If the safeguards are ineffective, then they need to be fixed. Allowing BNSF to point to those safeguards to escape punitive liability does not further this goal, does not further Congress's goal of bringing railroads to account for wrongful discrimination, and does not further the goal of punitive damages themselves. Because BNSF cannot establish that the law applies, it cannot establish its entitlement to judgment as a matter of law.

Turning to BNSF's burden of proof argument, the Court instructed the jury as follows:

> If you find for Wooten on his Federal Rail Safety Act claim, you must determine whether he proved by a preponderance of the evidence that

BNSF's conduct which caused Wooten's harm was malicious, oppressive, or in reckless disregard of Wooten's rights. Conduct is malicious if it is accompanied by ill will, or spite, or if it is for the purpose of injuring Wooten. Conduct is in reckless disregard of Wooten's rights if, under the circumstances, it reflects complete indifference to Wooten's safety or rights, or if BNSF acts in the face of a perceived risk that its actions will violate Wooten's rights under federal law. An act or omission is oppressive if BNSF injures or damages or otherwise violates the rights of Wooten with unnecessary harshness or severity, such as by the misuse or abuse of authority or power or by the taking advantage or some weakness or disability or misfortune of Wooten.

(Doc. 284 at 32.) This instruction substantially mirrors the Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit. As directed by the Manual, the burden of proof for punitive damages "depends on the standards applicable to the underlying claim for relief." 9th Cir. Manual of Model Civil Jury Instructions 5.5 (2017 Edition). In this case the underlying claim for relief required Wooten to prove his case by a preponderance of the evidence. *Frost*, 914 F.3d at 1195. The use of this burden of proof comports with one of the conventional rules of civil litigation, that "parties need only prove their case by a preponderance of the evidence." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 253 (1989). Yet BNSF claims that the use of this standard is incongruous when BNSF must prove its affirmative defense by clear and convincing evidence. BNSF does not explain how this is incongruous in light of the above, and the Court does not find it so. The Court does not consider the punitive damage award grossly

-33-

excessive, monstrous, unsupported by the evidence, or based only on speculation or guesswork.

Having concluded that BNSF is not entitled to judgment as a matter of law, a new trial, or remittitur, the Court proceeds to address Wooten's requests to alter the judgment.

## II. Wooten's Motion for Amended Judgment

Wooten filed this Motion pursuant to Federal Rule of Civil Procedure 59(e). (Doc. 296 at 1.) Wooten requests that the Court amend the jury award to give him backpay under the FRSA, interest on this FRSA backpay award, prejudgment interest on his emotional distress damages award, and give him a tax "gross up." (Doc. 297 at 2–14.) There are four grounds upon which a Rule 59(e) motion may be granted: "1) the motion is necessary to correct manifest errors of law or fact upon which the judgment is based; 2) the moving party presents newly discovered or previously unavailable evidence; 3) the motion is necessary to prevent manifest injustice; or 4) there is an intervening change in controlling law." *Turner v. Burlington Northern Santa Fe Ry. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003) (internal quotation marks, citation, and emphasis omitted). This Court exercises "considerable discretion when considering a motion to amend judgment under Rule 59(e)." *Id.*

### A. Backpay under the FRSA

Wooten requests this Court "reapportion $167,038" from the jury's front pay award under the FRSA to a back pay award under that claim. (Doc. 297 at 2–3.) Wooten claims that the jury's award of $17,570 in back pay under his FELA claim shows that the jury "endorsed" the testimony from his forensic economist at trial. (*Id.* at 3.) Consequently, Wooten claims, it "is likely that this was a result of the jury misconstruing the verdict form's directive" that the jury should not award the same category of damages under both the FELA and FRSA. (*Id.*)

Of the four grounds upon which this Court can grant a motion to amend, Wooten's request as framed can only be viable within the first, as a motion "necessary to correct manifest errors of law or fact upon which the judgment is based." *Turner*, 338 F.3d at 1063. Indeed, the jury did award the exact amount of back pay calculated by Opp to compensate Wooten under FELA. Nonetheless, the jury did not award Wooten the back pay amount Opp suggested would compensate Wooten under the FRSA. (*See* Docs. 283-155 at 1; 289 at 3–4.) And the jury was directed not to award a category of damages under the FRSA claim that it had awarded under the FELA claim. (Doc. 289 at 4.) Wooten's speculation concerning the jury's intent fails to show a manifest error of law or fact that would warrant the relief he requests. Because Wooten has not shown that the back pay

–35–

award is warranted, the Court need not address his argument concerning interest on that award.

## B. Prejudgment Interest on Emotional-Distress Damages

Wooten next requests that this Court grant him prejudgment interest on the jury's emotional-distress damages award to fully compensate him for his injury. "[T]he ultimate decision whether to award prejudgment interest lies within the court's sound discretion, to be answered by the balancing of equities." *Barnard v. Theobald*, 721 F.3d 1069, 1078 (9th Cir. 2013) (internal quotation marks and citation omitted). "The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss." *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995). Indeed, the United States Supreme Court has noted that its cases "since 1933 have consistently acknowledged that a monetary award does not fully compensate for an injury unless it includes an interest component." *Kansas v. Colorado*, 533 U.S. 1, 10 (2001). Pre-judgment interest is "an element of compensation" and "not a penalty." *Barnard*, 721 F.3d at 1078. BNSF argues that the balance of equities does not support the award of pre-judgment interest because the award itself is "excessive," unsupported by the evidence, and "undoubtedly" made Wooten "more than . . . whole." (Doc. 306 at 20–21.) Because the Court does not agree with any

of these descriptions of the jury award, and BNSF has made no further argument as to the balance of equities, the Court finds that prejudgment interest is appropriate here to fully compensate Wooten for his injury.

The question thus becomes what the rate of interest should be. "Generally, the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of prejudgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate." *Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 628 (9th Cir. 2007) (internal quotation marks and citation omitted). Wooten, for his part, asserts that the Court should calculate prejudgment interest according to regulations promulgated by the Department of Labor. (Doc. 297 at 4–11.) Wooten claims that this method for calculating prejudgment interest would have been used had he continued to pursue his case through the administrative process instead of "electing to invoke his right under the FRSA" and he "should not be penalized" with a different interest rate for that decision. (*Id.* at 6.) While Wooten has presented a reliable means for calculating prejudgment interest at a rate different from the one provided by 28 U.S.C. § 1961, the Court is not satisfied that this constitutes substantial evidence showing that "the equities" of his case require this alternative rate. The suggested rate may be higher, but that does not mean that the

equities of the case require it. Consequently, the Court will award pre-judgment interest as provided by § 1961.

Interest awarded under § 1961 "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[ ] the date of the judgment." 28 U.S.C. § 1961(a). "Interest shall be computed daily to the date of payment . . . and shall be compounded annually." 28 U.S.C. § 1961(b). The relevant time period is September 29, 2015, the date BNSF terminated Wooten, through November 7, 2018, the date judgment was entered. This is a period of 1,136 days. The weekly average one-year constant maturity treasury yield for the week ending November 2, 2018 was 2.67%. *See* Board of Governors of the Federal Reserve System, *Data Download Program*, https://www/federalreserve.gov/datadownload/Choose. aspx?rel=H.15 (accessed Apr. 23, 2019). The Court, in its discretion, will award prejudgment interest on Wooten's $500,000 emotional distress award in the amount of $42,732.47.

### C. Tax Gross Up

Noting again that the FRSA is a "make whole" statute, Wooten's final argument in support of amendment suggests that this Court's equitable powers

allow it to "include in the damage award additional money to insulate successful plaintiffs from adverse tax consequences resulting from recovery of damages sustained as a result of the defendant's unlawful conduct." (Doc. 297 at 12–13.) The type of relief Wooten is seeking here is generally known as a tax "gross up." Based on a Washington State Court of Appeals case interpreting a Washington anti-discrimination statute, Wooten claims he is entitled to a tax gross up at this time. (Doc. 297 at 14–16.) The requested gross up would require BNSF to compensate Wooten for the increased tax burden he will face as a result of obtaining the jury award in one lump sum instead of on a paycheck to paycheck basis.

This Court declined to give an instruction to the jury on the tax gross up and similarly declined to include a line of damages on the verdict form for such relief. Nonetheless, the Court allowed Wooten's forensic economist, Opp, to present exhibits and testimony on the amount he believed necessary to insulate Wooten from the tax consequences of a one-time payment of the total jury award. Additionally, the Court allowed Wooten to present evidence and argument on this issue throughout the trial. As has been discussed above, the jury awarded Wooten front pay in the amount of $1,407,978, a number between Opp's proposed front pay awards of $1,329,014 for approximately 30 years of BNSF work and

$1,546,143 for approximately 37 years of work at BNSF. (Docs. 283-155 at 2; 289 at 4.) Yet Wooten claims that the jury award should have included a tax gross up and did not.

First, the Court cannot be positive that the jury, after hearing Opp's testimony and Wooten's argument, did not take the tax consequences of a lump sum payment into account—the award falls between Opp's calculations of the loss amount. Second, Wooten has not provided controlling authority requiring this Court to exercise its equitable powers to this end. Third, although the Court does not find the jury award excessive or unsupported, the Court is not convinced that the balance of equities requires BNSF to shoulder the tax consequences of a protracted front pay award intended to compensate Wooten for over 30 years of missed employment with BNSF.[7]

Based on the above, Wooten's Motion to Amend the Judgment will be granted in part and denied in part. The Court will not amend the judgment to reallocate a portion of the FRSA front pay award to a back pay award or to provide Wooten with a tax gross up. The Court will amend the judgment to provide Wooten with prejudgment interest on his emotional-distress damages award in the

---

[7] It is also worth noting that Congress has provided that, for "federal income tax purposes, 'gross income' means 'all income' '[e]xcept as otherwise provided.'" *BNSF Ry. Co. v. Loos*, 139 S. Ct. 893, 903 (2019) (quoting 26 U.S.C. § 61)). However, as far as this Court can discern, Congress has not excepted front pay awards under the FRSA from taxation.

amount of $42,732.47. The Court now turns to Wooten's Motion for Attorneys' Fees and Costs.

## III. Wooten's Bill of Costs and Motion for Attorneys' Fees and Costs

Also pending before the Court at this time are Wooten's Bill of Costs (Doc. 295) and Motion for Attorneys' Fees and Non-Taxable Costs Pursuant to 49 U.S.C. § 20109 (Doc. 301). BNSF has objected to Wooten's Bill of Costs and requests the Court deny Wooten's Motion for Attorneys' Fees and Non-Taxable Costs "*ab initio.*" (Doc. 309 at 6.) The Court begins its analysis under this section with Wooten's Motion before proceeding to his Bill of Costs.

### A. Attorneys' Fees and Costs

Wooten's success on his FRSA claim entitles him to "any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees." 49 U.S.C. § 20109(e)(2)(C). BNSF takes issue with both the reasonableness of Wooten's attorneys' fees calculation, his non-taxable costs requests, and his expert witness fees.

#### i. Attorneys' Fees

Courts in the Ninth Circuit "must calculate awards for attorneys' fees using the lodestar method, and the amount of that fee must be determined on the facts of each case." *Camacho v. Bridgeport Financial, Inc.*, 523 F.3d 973, 978 (9th Cir.

2008) (internal quotation marks and citations omitted). "The lodestar is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Id.* (internal quotation marks and citation omitted). The party seeking fees "must submit evidence supporting the hours worked and the rates claimed" and the Court should exclude from its calculation "hours that are not reasonably expended because they are 'excessive, redundant, or otherwise unnecessary.'" *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). The lodestar is presumed to be reasonable but can be adjusted upward or downward "only in rare and exceptional cases" when "supported by both specific evidence on the record and detailed findings by the lower courts that the lodestar amount is unreasonably low or unreasonably high." *Id.* (internal quotation marks and citations omitted).

### a. Hourly Rates

Wooten submits that a reasonable rate for his representation in this matter would be $600/hour for William G. Jungbauer, $400/hour for John D. Magnuson, $325/hour for Christopher W. Bowman, and $400/hour for Michael P. McReynold. (Doc. 302 at 12.) Additionally, Wooten submits that a reasonable rate for the work performed by the paralegal Nate Miller would be $150/hour and administrative

-42-

assistant Shivohn Colwell would be $100/hour.[8] (Docs. 302 at 12; 302-3 at 19.)

Wooten claims that his legal team deserves these rates because it brought "decades of experience specifically dealing with the railroad industry" which made the team particularly suited to handling the intricacies of litigating his FRSA suit. Indeed, Wooten's team has demonstrated a thorough and reliable understanding of the state of FRSA litigation on a national scale. Nevertheless, this Court has more to weigh than merely the experience and effectiveness of Wooten's counsel and, naturally, BNSF claims these rates are exorbitant.

This Court exercises a "great deal of discretion in determining the reasonableness of the fee." *Gates v. Deukmejian*, 987 F.3d 1392, 1398 (9th Cir. 1992). This discretion is warranted "in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley*, 461 U.S. at 437. Nonetheless, there are parameters to the exercise of this Court's discretion. First, the Court must define the relevant community that will serve as a basis for determining the reasonableness of the fee award. Second, the Court must determine what the prevailing market rate is for the completed work in the relevant

---

[8] BNSF appropriately argues that the time spent by an administrative assistant on this case should be considered clerical in nature and subsumed in firm overhead rather than billed at paralegal rates. *See Nadarajah v. Holder*, 569 F.3d 906, 921 (9th Cir. 2009). The Court is satisfied that Colwell's work on this project was clerical in nature and, consequently, the Court will not consider Colwell's time when calculating the lodestar. (*See* Doc. 302-3 at 50.)

community. *Camacho*, 523 F.3d at 978–80. This rate should represent what a lawyer of comparable skill, experience, and reputation could command in the same community for comparably complex litigation. *Blum v. Stenson*, 465 U.S. 886, 895 (1984).

Generally, "the relevant community is the forum in which the district court sits." *Id.* However, rates outside the forum may be used "if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case." *Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir. 1997). Wooten claims that rates outside the District of Montana should be considered in this case because the complexity of this litigation required the caliber of representation that could only be attained by attorneys with "nationwide experience in railroad litigation." (Doc. 315 at 4.) Accordingly, Wooten requests that the "relevant community" be defined as "attorneys with nationwide experience in railroad litigation." (*Id.*) BNSF claims that the Court should limit Wooten's counsels' fees to the prevailing rates for counsel in the Missoula, Montana: $220/hour for lead counsel, $195/hour for secondary counsel, and $95/hour for paralegals. (Doc. 309 at 12.)

While this Court is certainly reluctant to state that Montana attorneys are unable to perform this type of litigation because of a lack of experience, expertise, or specialization, the Court is also unaware of a Montana law firm that is currently representing claimants in FRSA litigation at this level. To be sure, FRSA litigation is highly specialized and Wooten's attorneys have risen to national prominence in this area of law for good reason. Although the Court declines to define the relevant community as broadly as "attorneys with nationwide experience in railroad litigation," the Court will expand the relevant community to include the Pacific Northwest, with an eye towards the Western District of Washington—where Wooten's attorneys, Yaeger & Jungbauer Barristers, PLC ("YJB"), have recently had the reasonableness of their fees evaluated in two separate cases.

Turning to the determination of the prevailing market rate in the community as defined, Wooten bears the burden of producing "satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 895 n. 11. Wooten has submitted the affidavits of his attorneys in support of their rates, national surveys of market rates on a national scale, and the declarations of other attorneys with similar railroad-litigation practices that support YJB's requested

-45-

rates. (*See* Docs. 120-1 at 8–12, 148; 302-1; 302-2; 302-3 at 12–17; 302-4; 302-16.) Additionally, this Court is aware of two instances where the Western District of Washington has made a rate determination for YJB: *Wallis v. BNSF Ry. Co.*, 2014 WL 1648472 (W.D. Wash. Apr. 23, 2014), and *Rookaird v. BNSF Ry. Co.*, 2016 WL 7180305 (W.D. Wash. Dec. 9, 2016). *Rookaird* relied heavily upon the earlier decision in *Wallis* and modified the rates for YJB only to the extent warranted by the passage of time and increased participation and responsibility of Jungbauer's supporting lawyers. *Rookaird*, 2016 WL 7180305, at *3 (citing *Wallis*, 2014 WL 1648472, at *3). In 2016, the Western District of Washington awarded Jungbauer $425/hour, Bowman $275/hour, and paralegal Miller $110/hour. *Id.* YJB also retained local counsel to assist in the litigation of *Wallis* and *Rookaird*. The rate for this attorney, who sat second chair during trials, was determined to be $350/hour. *Id.*

These rates do not seem particularly unreasonable considering the degree of risk involved in taking on a FRSA claim on a contingency basis, YJB's national prominence in FRSA litigation, the level of knowledge required to successfully litigate a FRSA claim, and the level of competency and diligence required to successfully litigate this particularly contentious FRSA claim. YJB's collective courtroom experience, education, and prior work on complex cases is highly

indicative of the firms overall "quality of representation" and supports a similar award in this case. *Blum*, 465 U.S. at 898–99. Accordingly, the Court determines that the prevailing market rate for YJB's services in this case is as follows: $425/hour for Jungbauer, $350/hour for both Magnuson and McReynolds, $275/hour for Bowman, and $110/hour for paralegal Miller.

### b. Hours Reasonably Expended

When determining the number of hours to be used to calculate the lodestar, the Court should exclude those "hours that were not reasonably expended." *Hensley*, 461 U.S. at 434 (internal quotation marks and citation omitted). The party seeking fees "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Id.* Wooten's attorneys have each submitted an affidavit and time sheets to justify the hours they have expended on this case. Additionally, Wooten asserts that their calculations "do not include time spent on ministerial tasks, nor do they include time that was spent solely on prosecution of [his] FELA and LIA claims." (Doc. 302 at 13.) Wooten submits that his attorneys spent the following amounts of time (in hours) litigating his FRSA claim: Jungbauer 754:49, Magnuson 509:36, Bowman 686:57, McReynolds 57:12, Miller 385:32. (*Id.* at 12.) BNSF claims that Wooten's requested time is excessive when compared to other FRSA cases and inflated by

hours spent litigating the FELA and LIA claims. (Doc. 309 at 13, 16.) BNSF

claims that Wooten "created this problem," so it is his burden to solve it by

providing conclusive records showing which work was for each claim. (*Id.* at 7.)

The task before this Court is to determine whether, "in light of the

circumstances, the time could reasonably have been billed to a private client."

*Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008). Of particular

import in this case, the Ninth Circuit has stated:

> It must also be kept in mind that lawyers are not likely to spend
> unnecessary time on contingency fee cases in the hope of inflating
> their fees. The payoff is too uncertain, as to both the result and the
> amount of the fee. . . . By and large, the court should defer to the
> winning lawyer's professional judgment as to how much time he was
> required to spend on the case; after all, he won, and might not have,
> had he been more of a slacker.

*Id.* at 1112. The Court must provide "concise but *clear*" explanation for its award.

*Id.* at 1111 (quoting *Hensley*, 461 U.S. at 437 (emphasis added by Ninth Circuit)).

And the larger the difference between the attorney's requested award and the final

award, "the more specific articulation of the court's reasoning is expected." *Id.*

### 1. BNSF's general objections to time calculation

BNSF has taken an extremely hostile view of YJB's calculation of its

expended hours. For example, of Jungbauer's nearly 755 hours claimed, BNSF

has objected to all but 33. (*Compare* Doc. 302-1 at 11–22 *with* Doc. 309-4 at 1–

21.) This is unreasonable. "[T]rial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011). With this in mind, the Court proceeds to an analysis of BNSF's arguments.

BNSF claims that Wooten's request impermissibly intermingles the time spent litigating his FELA and LIA claims with the time spent litigating his FRSA claim. However, BNSF made the circumstances supporting Wooten's FELA claim central and directly relevant to Wooten's FRSA claim. Owing to the overlap and thorough intertwining of these claims, the Court is not convinced that, had the claims been bifurcated, the hours claimed on the FRSA claim would have been significantly less. Contrary to BNSF's assertion, Wooten did not create this problem, BNSF did when it wrongfully terminated Wooten after claiming that he had lied in making an injury report. Moreover, Wooten asserts that he has made a good faith effort to parse out the work performed on these claims and the Court is obligated to defer to YJB's calculation. *Id.* at 1112.

Nonetheless, after reviewing the line item entries in YJB's timesheets, the Court finds that there is a commingling of activities that pertain to the litigation of both the FELA and FRSA claims. This overlap of activities was probably

-49-

inescapable in this case, but nevertheless warrants an adjustment, which can be accomplished by the application of a 10% "haircut." *Moreno*, 534 F.3d at 1112.

As to BNSF's assertion that the Court should compare the total number of hours spent in other cases to determine the reasonableness of YJB's calculation, the Court does not find a comparison of hours spent in seemingly randomly selected FRSA cases across the country to be useful. Each case is different and presents its own unique challenges. This particular case was fought tooth and nail from the beginning and involved protracted and contentious discovery disputes, extensive motion practice, an eleven-day trial, and, as has been stated previously in this case, a dismaying lack of cooperation between the parties.

BNSF claims that the amount of hours Wooten claims is so "stunning" as to result in "no award at all." (Doc. 309 at 13.) The Court does not share BNSF's alarm at the sheer number of hours claimed. Combined, YJB calculates that its team expended nearly 2,400 hours litigating this case since its inception in September 2015. (Doc. 302 at 12.) The trial consumed eleven long days. Disregarding the fact that the attorneys for both parties likely spent upwards of 16 hours a day throughout the trial working on this case, the Court can confidently estimate that Jungbauer, Magnuson, Bowman, and Miller spent at least 8 hours in the courtroom on each day of trial. Compared to the 2,400 hours spent litigating

this claim, this means that roughly 15% of their time was spent physically trying

this case. In this Court's experience with cases as heavily litigated as this one, this

is not surprising. As noted by Wooten, the Court has limited information in the

record available to compare the hours expended by BNSF litigating this case. But,

of the information that is available, BNSF spent over three times the number of

hours spent by YJB litigating motions to compel in front of the United States

Magistrate Judge in this case. (*Compare* Doc. 120 at 9 *with* Doc. 119-1 at 9 *and*

Doc. 119-2 at 2–3.) After reviewing YJB's timesheets, the Court finds that, apart

from the 10% haircut and the specific items to be removed from the lodestar

calculation to follow, the hours were reasonably expended, meticulously recorded,

and are not excessive, redundant, or otherwise unnecessary.

### 2. BNSF specific objections to time calculation[9]

### 2.1 Voelker Motion

BNSF claims that YJB's time expended seeking to enjoin BNSF's

investigation into Mark Voelker's conduct is inappropriate because it was

"unsuccessful" and "did not have any bearing on [Wooten's] FRSA claims." (Doc.

309 at 14–15.) Wooten counters that merely because a motion was unsuccessful

does not mean that it was unreasonable. Wooten also asserts that he sought the

---

[9] BNSF's argument that YJB engaged in inappropriate "block billing" is without merit. (Doc.
309 at 14.) YJB has provided a sufficiently meticulous and detailed account of its time in this
matter.

injunction because of a concern that BNSF's investigation of his co-workers would create a "chilling effect" that would make it harder for him to pursue justice. (Doc. 315 at 9–10.) While the Court appreciates the potential chilling effect BNSF's investigation would have, the Court continues to believe that this chilling effect did not have any "impact on [Wooten] in this litigation." (Doc. 34 at 6.) Additionally, YJB has already filed a complaint against BNSF in this Court on behalf of Voelker. *See Voelker v. BNSF Ry. Co.*, No. CV 18–172–M–DLC, Doc. 1 (D. Mont. Sept. 27, 2018). The hours expended on Voelker's behalf appear unrelated to the subject case. However, Voelker's deposition and assistance to YJB in this case, although not presented at trial, were reasonably expended and billable on Wooten's behalf. Consequently, the Court will reduce only those hours which were expended litigating the injunction of Voelker's investigation. After review, the Court finds that Jungbauer spent approximately 2.4 hours working on the Voelker Motion and Bowman spent approximately 12.4 hours on that assignment. (Doc. 309-4 at 3–49.) The Court will not include these hours in the lodestar.

## 2.2 Hart Matter

BNSF asserts that Wooten's counsel should not be compensated for time spent litigating the propriety of YJB's use of internal BNSF documents obtained through YJB's contact with Michael Hart. BNSF argues that YJB is not entitled to

"fees related to misconduct that was worthy of sanctions" and, further, that YJB should not be entitled to fees accrued during the deposition of Nancy Ahern, when the subject documents first surfaced. (*Id.* at 15.) In response, Wooten asserts that the Court did not impose all of the sanctions BNSF requested. (Doc. 315 at 10.) The Court fails to see how this is relevant. The fact of the matter is that "Wooten's counsel used internal BNSF documents at Ahern's deposition that he knew or reasonably should have known were misappropriated by Hart, without providing notice to BNSF or the Court." (Doc. 200 at 45.) Sanctions were imposed because YJB "effectively circumvented the federal discovery rules by acquiring and using those documents at Ahern's deposition without notice to BNSF or the Court." (*Id.*) The Court will not now allow YJB to recover fees for time spent litigating the Hart matter or the propriety of sanctions. However, merely because the documents surfaced at Ahern's deposition does not mean that YJB's time spent at that deposition should be excluded. After review, the Court finds that Jungbauer spent approximately 15.1 hours on this issue, Magnuson spent 0.75 hours, and Bowman spent approximately 33.8 hours. (Doc. 309-4 at 5–63.) These hours will be excluded from the lodestar calculation.

## 2.3 Sanctions and ESI

BNSF asserts that Wooten should not recover attorneys' fees for the "hundreds of hours" spent "chasing 'goblins' in discovery and seeking discovery sanctions." (Doc. 309 at 15–16.) BNSF provides no support for its contention that this time is unrecoverable, it merely asserts that the information sought related to the FELA claim and "had no bearing on the outcome of the FRSA case." (*Id.* at 15–16.) BNSF's position is both unsupported and untenable. Again, BNSF made the facts of Wooten's FELA claim relevant to Wooten's FRSA claim. The Court cannot be convinced that Wooten's search for video evidence of the incident, for example, "had no bearing on the outcome of the FRSA case" when BNSF claimed that his version of events were fabricated. Additionally, the Court does not find that Wooten's efforts relating to discovery and discovery sanctions were unreasonably expended, excessive, redundant, or otherwise unnecessary. Conversely, these efforts were largely successful and essential to Wooten's case.

## 2.4 Fees-on-Fees

BNSF contends that Wooten should not be entitled to an award of fees incurred in seeking recovery of attorneys' fees in this matter. BNSF fails to cite to controlling authority on this matter. The Ninth Circuit permits so called "fees-on-fees" and they are warranted in this case. *Thompson v. Gomez*, 45 F.3d 1365, 1367

(9th Cir. 1995). Moreover, the Court does not see any reason to reduce YJB's fees-on-fees.

### c. Lodestar Calculation

Based on the above, the Court will reduce Jungbauer's time by 17.5 hours, Magnuson's time by 0.75 hours, and Bowman's time by 46.2 hours to reflect the Court's decision regarding YB's time spent on the Voelker and Hart matters. The Court will then impose a 10% "haircut" to reflect the inextricable intertwining of the work performed on the FELA and FRSA claims. Time has been rounded to the nearest tenth of an hour and amounts to the nearest dollar. Accordingly, the lodestar is:

| Name | Reasonable Hourly Rate | Hours Requested | Reasonable Hours | Fee |
|------|------------------------|-----------------|------------------|-----|
| Jungbauer | $425 | 754.8 | 663.6 | $282,030 |
| Magnuson | $350 | 509.6 | 458 | $160,300 |
| Bowman | $275 | 687 | 576.7 | $158,593 |
| McReynolds | $350 | 57.2 | 51.5 | $18,025 |
| Miller | $110 | 385.5 | 346.9 | $38,159 |
| | | | Total | $657,107 |

The lodestar is presumed to be reasonable. *Van Gerwen*, 214 F.3d at 1045. Nonetheless, in "rare and exceptional cases" the Court may apply a multiplier to adjust a lodestar amount that is "unreasonably low or unreasonably high." *Id.* (internal quotation marks and citations omitted). The application of a multiplier must be "supported by both specific evidence on the record and detailed findings"

-55-

as to why the lodestar is unreasonable. *Id.* (internal quotation marks and citations omitted). After thorough review, and based on all of the above, the Court is satisfied that the lodestar amount is reasonable and no adjustment, other than the 10% "haircut," is warranted.

### ii. Non-Taxable Costs

While the FRSA undeniably allows for Wooten's recovery of "litigation costs," it does not define that term. *See* 49 U.S.C. § 20109(e)(2)(C). The Ninth Circuit has found "out-of-pocket" expenses that would normally be charged to a fee-paying client are compensable. *See Grove v. Wells Fargo Fin. California, Inc.*, 606 F.3d 577, 580–81 (9th Cir. 2010). These are precisely the types of litigation costs Wooten seeks here. Following is a discussion of each category of costs sought by Wooten. Because the Court has thoroughly expressed its view of the matter throughout this Order, none of BNSF's arguments pertaining to the intertwining of costs accrued litigating the FELA claim will be addressed—these costs are too essential to the FRSA claim to be omitted.[10]

---

[10] BNSF also asserts that costs attributable to YJB's investigator, Jim Larkin, are not recoverable. (Doc. 309 at 20.) In this Court's experience, the decision to hire an investigator is both extremely common and highly efficient. This is particularly so when counsel is out-of-state. YJB's submitted costs in relation to Larkin fall squarely within the sort that would normally be charged to a fee-paying client. This argument is entirely without merit and will not be addressed further.

### a. Postage & Shipping Costs

Wooten has submitted postage charges from the United States Postal Service and Federal Express totaling $1,281.62. (Docs. 302 at 17; 302-5 at 1–13.) BNSF's arguments to the contrary notwithstanding, these costs are supported and will be awarded.

### b. Travel Expenses

Wooten seeks to recover travel costs incurred by YJB. These costs total $18,141.50 in airfare and $3,716.07 in ground transportation. (Doc. 302 at 18–19, 21.) BNSF asserts that Wooten should not be able to recover airfare "for three attorneys and an investigator to attend the Preliminary Pretrial Conference on January 24, 2017" when only lead counsel was required to attend. (Doc. 309 at 21–22.) Although the Court acknowledges that only lead counsel is *required* to attend the Preliminary Pretrial Conference, the Court encourages the attendance of all counsel. The Court finds that the physical presence of all counsel furthers the underlying objectives of these conferences. This is especially so when, as here, there are out-of-state attorneys who may be otherwise unfamiliar with the Court, opposing counsel, or the particular expectations of practice in this district. Additionally, the Court found Larkin's contributions helpful to forming a preliminary understanding of the facts underlying the case. Consequently, the

Court will not exclude YJB's airfare incurred attending the Preliminary Pretrial Conference. However, the Court will exclude Larkin's ground transportation cost of $215.82 which was accrued around the January 25, 2017 Pretrial Conference and appears to be an error in light of his submitted flight receipt for that trip.[11] (Docs. 302 at 21; 302-6 at 3.)

BNSF next claims that YJB's airfare costs should be reduced by 50% because the tickets were first class. (Doc. 309 at 21–22.) Wooten counters that first-class tickets are "approximately 25%" more expensive than main cabin flights but that baggage fees close the gap between the fares. (Doc. 315 at 14.) This assertion is only partially borne out by Wooten's submitted evidence. Comparing one-way airfare with two checked bags, first-class fare is only 14% more expensive.[12] However, comparing round-trip airfare with one checked bag, first-class fare is 34% more expensive.[13] Additional costs incurred through YJB's

[11] BNSF's remaining arguments regarding ground expenses are without merit and will not be addressed.

[12] Basic economy airfare was $330.20 per ticket, plus a $70 fee for checking two bags for a total one-way cost of $400.20. First-class fare allows passengers to check two bags without incurring additional cost for a total of $454.20. (Docs. 315-1 at 2; 315-2 at 1.) At these prices, first-class fare costs 14% more than basic economy when passengers bring two bags that require checking ($454.20 minus $400.20 equals $54.00, $54.00 divided by $400.20 equals 0.135 or 14%). The Court will not analyze the propriety of each passenger checking two bags, this packing seems reasonable in light of the length of trial.

[13] Basic economy airfare was $496.20 per ticket, plus a $30 fee for checking one bag each way for a total round-trip cost of $556.20. First-class fare exempts the baggage fee but costs $746.20. (Docs. 315-1 at 1; 315-2 at 1.) This is an increase of 34% over basic economy when one each passenger checks one bag each way ($746.20 minus $556.20 equals $190.00, $190.00 divided by $556.20 equals 0.342 or 34%).

decision to fly first class are the definition of excessive and unnecessary. Based on the evidence before it, the Court will reduce counsels' airfare for trial by 14% and all other airfare by 34%. Rounded to the nearest whole dollar, the reduction is as follows:

| Departure Date | Person | Requested Fare | Reason for Reduction | Awarded Fare |
|---|---|---|---|---|
| 1/19/17 | Jungbauer | $746 | Excessive first-class fare, 34% reduction | $492 |
| 1/23/17 | Magnuson | $746 | Excessive first-class fare, 34% reduction | $492 |
| 1/23/17 | Bowman | $746 | Excessive first-class fare, 34% reduction | $492 |
| 1/22/17 | Larkin | $646 | Excessive first-class fare, 34% reduction | $426 |
| 6/21/17 | Jungbauer | $405 | Excessive first-class fare, 34% reduction | $267 |
| 6/30/17 | Jungbauer | $6 | Excessive first-class fare, 34% reduction | $4 |
| 8/14/17 | Jungbauer | $837 | Excessive first-class fare, 34% reduction | $552 |
| 10/9/17 | Magnuson | $402 | Excessive first-class fare, 34% reduction | $265 |
| 10/10/17 | Jungbauer | $592 | Excessive first-class fare, 34% reduction | $391 |
| 10/16/17 | Wooten[14] | $1,423 | Excessive first-class fare, 34% reduction | $939 |
| 12/17/17 | Jungbauer | $1,020 | Excessive first-class fare, 34% reduction | $673 |
| 1/23/18 | Jungbauer | $658 | Excessive first-class fare, 34% reduction | $434 |

[14] BNSF objects to the inclusion of Wooten's personal airfare for a trip to meet with his attorneys in Minnesota. (Doc. 309-5 at 2.) BNSF provides no support for its position that this is not a litigation cost and the Court is satisfied that it is.

| 1/23/18 | Miller | $718 | Excessive first-class fare, 34% reduction | $474 |
|---------|--------|------|-------------------------------------------|------|
| 2/21/18 | Jungbauer & Bowman | $2,441 | Excessive first-class fare, 34% reduction | $1,611 |
| 3/13/18 | Magnuson | $1,188 | Excessive first-class fare, 34% reduction | $784 |
| 5/21/18 | Jungbauer | $842 | Excessive first-class fare, 34% reduction | $556 |
| 5/21/18 | Bowman | $1,020 | Excessive first-class fare, 34% reduction | $673 |
| 10/17/18 | Magnuson | $1,144 | Excessive first-class fare, 14% reduction | $984 |
| 10/17/18 | Bowman | $721 | Excessive first-class fare, 14% reduction | $620 |
| 10/17/18 | Jungbauer | $834 | Excessive first-class fare, 14% reduction | $717 |
| 10/17/18 | Miller | $1,005 | Excessive first-class fare, 14% reduction | $864 |
| | | | **Total** | $12,710 |

The total cost of ground transportation, rounded to the nearest dollar and with the exception of Larkin's mileage on January 25, 2017, as discussed above, is $3,500. Accordingly, the Court awards $16,210 in travel costs.

## c. Room & Board Expenses

Wooten seeks to recover YJB's hotel expenses totaling $28,682.49. (Doc. 302 at 23.) Wooten requests a per diem rate to cover YJB's meal expenses incurred while traveling. Wooten requests the per diem rate established by the United States General Services Administration for travel in the relevant states visited during litigation. (Docs. 302 at 19; 302-9 at 1–5.) The Court finds that

these requests are adequately supported, were reasonably incurred, and are not excessive or unnecessary. Accordingly, the Court will award hotel expenses in the amount of $28,682.49 and per diem totaling $11,751.50.

## d. Legal Research Databases

Wooten requests $36,652.18 in compensation for fees incurred by YJB through PACER and WestLaw. (Doc. 302 at 24.) BNSF argues that these fees are typically "baked into the hourly fee award." (Doc. 309 at 23.) The Ninth Circuit has allows the recovery of "reasonable charges for computerized research" if "separate billing for such expenses if the prevailing practice in the local community." *Trustees of Constr. Indus. and Laborers Health and Welfare Trust v. Redland Ins. Co.*, 460 F.3d 1253, 1258–59 (9th Cir. 2006) (internal quotation marks and citation omitted). In this Court's experience, the general practice of the local community is, indeed, to include legal research fees in an attorney's hourly rate. Wooten has presented no evidence to the contrary.[15] Accordingly, the Court will not award legal research fees.

## e. Transcript & Videographer Expenses

Wooten requests $28,432.86 in costs paid for videography and transcription. (Doc. 302 at 24–27.) BNSF objects that the rates charged for transcription should

---

[15] Rather, Wooten presents evidence that YJB has a "full-coverage plan." (Docs. 302. at 24; 302-13.)

-61-

be lower in accordance with this Court's Local Rule 54.1(b)(1)(C). (Doc. 309 at 23–24.) Wooten correctly notes that Local Rule 54.1(b) applies to taxable costs. Here, the charges reflect the amount YJB paid for the videography and transcription and the amount that YJB would pass on to a fee-paying client. While the Court agrees that Wooten should not recover costs paid in relation to the Hart matter, the Court believes that costs incurred during Voelker's deposition would have been passed on to Wooten. The Court finds $4,645.25 were incurred in relation to the Hart matter. (Doc. 309-5 at 6–11.) Accordingly, the Court awards $23,787.61 in videography and transcription costs.[16]

### iii. Expert Witness Fees

The FRSA specifically allows for the recovery of expert witness fees. 49 U.S.C. § 20109(e)(2)(C). Wooten submits documentation showing that litigation of this case resulted in $244,107.77 in expert witness fees. (Docs. 302 at 27–28.) Characteristically, BNSF objects to nearly every aspect of this request. These objections are largely recitations of arguments this Court has thoroughly discussed and found lacking in this Order and will not be rehashed here. BNSF claims that Wooten is required to provide receipts showing that he paid the amounts requested.

---

[16] The Court does not find BNSF's remaining challenges persuasive. In this Court's experience, the litigation of a case will always result in investigation of matters that are not ultimately relevant to the presentation of the case but that, in due diligence, must be investigated nonetheless and would normally result in fees passed on to a fee-paying client.

This argument is unsupported. The Court will not reduce Wooten's expert witness fees based on BNSF's insinuation that Wooten has misrepresented what was actually charged on his invoices. BNSF's argument regarding FELA is again entirely without merit. BNSF's arguments regarding expert fees in relation to his cell phone are without merit—Wooten *successfully* prevented BNSF from obtaining his cell phone and compelling Wooten to turn over a forensic examination of the phone. (Doc. 200 at 48–49.) BNSF made these expenses necessary, even if it did not ultimately reap the fruits of this expense. BNSF's argument that Wooten's experts charged amounts that are unreasonable in Missoula is belied by the fact that BNSF spared no expense retaining the best experts to present its side of this case. The Court will not unilaterally extinguish one side's ability to fight fire with fire.

Nonetheless, as asserted by BNSF, there are instances where Wooten has failed to provide sufficient documentation for the Court to assess the necessity of certain charges. However, these instances are not as pervasive as BNSF represents. While the Court is loath to state the obvious, the undersigned was present at trial and is very familiar with this case. The overwhelming majority of the charges do not need the level of punctilious specificity that BNSF requests in order for the Court to find them logically related and necessary to the litigation of

this case. The Court again declines to become a "green-eyeshade accountant" and will pursue "rough justice" in relation to this fee award. *Fox*, 563 U.S. at 838. The Court finds the following invoices unsupported and will reduce the expert witness fee award accordingly: Authentic, Inc. invoice for $1,695.00 (Doc. 302-15 at 1) and David's Welding, LLC invoices totaling $8,419.07 (*Id.* at 27–29).

Based on the above, the Court awards Wooten $233,993.70 in expert witness fees.

## B. Wooten's Bill of Costs

The Court may tax costs as provided in 28 U.S.C. § 1920. Wooten has submitted a Bill of Costs totaling $30,601.85. (Doc. 295 at 1–2.) BNSF objects to numerous aspects of this bill. (Doc. 304.) The Court briefly considers each category in turn.

### i. Fees of the clerk

BNSF properly objects to the inclusion of YJB's *pro hac vice* fees. *See Kalitta Air LLC v. Cent. Texas Airborne Sys. Inc.*, 741 F.3d 955, 958 (9th Cir. 2013) (finding *pro hac vice* fees non-taxable). Additionally, for the reasons provided above regarding the Hart matter, the Court will not tax $47.00 in fees associated with litigating that issue. Consequently, the fees of the clerk will be limited to the $400.00 case filing fee.

### ii. Fees for service of summons and subpoena

Wooten requests $1,470.00 for service of summons and subpoenas in this case. (Doc. 295 at 1.) BNSF objects to a $75.00 service fee it asserts was accrued without a waiver request. BNSF properly asserts that Wooten had a duty to avoid "unnecessary expenses of serving the summons" pursuant Federal Rule of Civil Procedure 4(d)(1). Accordingly, the Court will not tax the $75.00 fee accrued serving a summons when the party did not exercise its duty to avoid "unnecessary expenses" by requesting waiver. The remainder of BNSF's objections lack merit and are overruled. Fees for service of summons and subpoena are limited to $1395.00.

### iii. Fees for printed or electronically recorded transcripts

Transcript fees are recoverable only if they are "necessarily obtained for use in the case." 28 U.S.C. § 1920(2). The Local Rules presume that transcripts are necessary if used "at trial, after trial, or in supporting or opposing a motion for summary judgment." L.R. 54.1(b)(1)(B)(ii). Accordingly, the Court will tax costs associated with the transcripts and videos that were used in trial, after trial, or in summary judgment. BNSF's objections that the transcript must be used at trial "to either refresh the witness' memory or for impeachment purposes" misstates the Local Rule and is overruled. BNSF's objection that transcript costs are limited to

the rate for reporter's fees misconstrues the Local Rule and is overruled. BNSF's remaining objections lack merit. After review, fees for printed or electronically recorded transcripts will be taxed in the amount of $19,844.89.

### iv. Fees for witnesses

Wooten seeks $1,823.05 in fees for witnesses. (Doc. 295 at 1.) "Costs and fees for witnesses paid under 28 U.S.C. § 1821 are allowed for each day a witness testifies at trial. Otherwise, the moving party must establish the witness's presence was required." L.R. 54.1(b)(2). BNSF objects that Wooten has submitted fees for deposition testimony that should not be paid under the rule. The Court agrees. Accordingly, the Court will not tax the fees associated with the depositions of James Pino and Robert McCallum totaling $154.00. (Doc. 295-4 at 1.) The remainder of BNSF's objections lack merit. Fees for witnesses will be taxed in the amount of $1,669.05.

### v. Fees for exemplification

"Reasonable costs of reproducing exhibits on the moving party's will-offer exhibit list are allowed. Otherwise, the moving party must establish the reasonable necessity of reproducing the exhibit." L.R. 54.1(b)(3)(A). Wooten seeks $4,355.91 in fees for exemplification. (Doc. 295 at 1.) However, Wooten has

made no effort to conform his request with the Local Rule. (Doc. 295-5 at 1–9.) Accordingly, BNSF's objection regarding fees for exemplification is sustained.

### vi. Other costs

Finally, Wooten seeks $2,151.00 in fees incurred setting up video conferencing that enabled two of his expert witnesses to testify remotely. (Doc. 295 at 1.) These charges stem from the video testimony of two expert witnesses. (Doc. 295-6 at 1.) "For expert witnesses, the party seeking costs may be entitled to recover only the statutory fees and mileage unless the presiding judge orders otherwise prior to the time costs are sought." L.R. 54.1(b)(2)(B). BNSF is correct that these fees do not fall within this definition. Consequently, they will not be taxed.[17]

CONCLUSION

For the foregoing reasons,

IT IS ORDERED that BNSF's Motion (Doc. 307) is DENIED.

IT IS FURTHER ORDERED that Wooten's Motion (Doc. 296) is GRANTED IN PART AND DENIED IN PART as specified herein. The Court awards $42,732.47 in prejudgment interest on the jury's $500,000 emotional-distress award.

---

[17] The Court declines to treat fees Wooten unsuccessfully sought to tax as litigation costs. (Doc. 302 at 16.) There is insufficient evidence to support that determination.

IT IS FURTHER ORDERED that Wooten's Motion (Doc. 301) is GRANTED IN PART AND DENIED IN PART. Wooten is awarded attorneys' fees in the amount of $657,107.00, expenses of $81,713.22, and expert witness fees of $233,993.70.

IT IS FURTHER ORDERED that, for the reasons stated herein, costs are taxed in the amount of $23,308.94 and included in the judgment.

DATED this **23rd** day of April, 2019.

Dana L. Christensen, Chief Judge
United States District Court